# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

3RED PARTNERS LLC,
on behalf of itself and all others similarly
situated,

      Plaintiff,

vs.

PERMIAN RESOURCES CORPORATION
f/k/a CENTENNIAL RESOURCE
DEVELOPMENT, INC., EXPAND
ENERGY CORPORATION f/k/a
CHESAPEAKE ENERGY CORPORATION,
CONTINENTAL RESOURCES INC.,
DIAMONDBACK ENERGY, INC.,  EOG
RESOURCES, INC., HESS
CORPORATION, OCCIDENTAL
PETROLEUM CORPORATION, PIONEER
NATURAL RESOURCES COMPANY,
SCOTT D. SHEFFIELD, JOHN B. HESS,
and JOHN DOES 1-60,

      Defendants.

Case No. _____

## PLAINTIFF'S CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS</u>

NATURE OF THE ACTION .................................................................................................1

PARTIES ...........................................................................................................................9

    I.     Plaintiff .................................................................................................................9

    II.    Defendants ...........................................................................................................10

    III.   Agents and Co-Conspirators ..............................................................................15

JURISDICTION AND VENUE .........................................................................................15

FACTUAL ALLEGATIONS .............................................................................................17

    I.     Glossary of Key Terms .......................................................................................17

    II.    WTI Futures Contracts, West Texas Intermediate Physical Crude Oil,
         and Other Closely Related Derivative Products .................................................18

    III.   Organization of the Petroleum Exporting Countries ("OPEC") .........................21

    IV.   U.S. Independents Alter Supply Dynamics ........................................................22

    V.    OPEC Reacts to Shale Oil Production ................................................................24

    VI.   OPEC Changes Tactics and Looks to Bring U.S. Shale to "the Table on Pricing"...27

    VII.  2021: Defendants Actualize Their Agreement Amongst Themselves
         and with OPEC .....................................................................................................37

    VIII. During 2022-2023, Prices Reach $200 Per Barrel ............................................45

    IX.   Defendants' "Restraint" Is Economically Irrational, Absent Agreement ...............62

    X.    Defendants Caused Artificial Prices in the WTI Futures Market ...........................67

    XI.   Plaintiff and Members of the Putative Class Were Injured as a Result
         of Defendants' Manipulation ...............................................................................69

    XII.  Plus Factors Indicative of Defendants' Conspiracy to Manipulate the
         Price of WTI and Related Derivative Products ...................................................77

   XIII.   Recent Regulatory Investigations ......................................................................88

CLASS ALLEGATIONS ...................................................................................................95

CAUSES OF ACTION ......................................................................................................98

PRAYER FOR RELIEF ...................................................................................................102

DEMAND FOR A JURY TRIAL ....................................................................................103

Plaintiff 3Red Partners LLC ("Plaintiff" or "3Red"), on behalf of itself and all other similarly situated persons and entities, bring claims against the following Defendants for their violations of law from no later than January 1, 2021 through the present (the "Class Period"): Permian Resources Corporation f/k/a Centennial Resource Development, Inc.; Expand Energy Corporation f/k/a Chesapeake Energy Corporation; Continental Resources Inc.; Diamondback Energy, Inc.; EOG Resources, Inc.; Hess Corporation; Occidental Petroleum Corporation; Pioneer Natural Resources Company; Scott D. Sheffield; and John B. Hess (collectively "Defendants"). Based upon personal knowledge, information and belief, and investigation of counsel, Plaintiff alleges as follows:

## NATURE OF THE ACTION

1.     This action arises from Defendants' conspiracy to coordinate, and ultimately constrain, domestic shale oil production. Defendants: (a) fixed, raised, and maintained the price of oil and crude oil futures contracts throughout the United States in violation of the Sherman Act; and (b) manipulated the price of West Texas Intermediate ("WTI") crude oil futures contracts and the commodity underlying the contracts in violation of the Commodity Exchange Act ("CEA").

2.     Shale oil, also called "tight oil," is a high-quality crude found between layers of shale rock, impermeable mudstone, or siltstone that can be extracted, refined, and used to produce gasoline, diesel fuel, and other commercial products sold in the U.S.

3.     Shale oil is produced by fracturing the rock formations that contain the layers of oil in a process known as hydraulic fracturing, or "fracking." Today, shale oil comprises almost two-

thirds of the onshore production of crude oil in the United States.[1]

4.      Shale oil, along with other crude oil, is sold to refineries. Refineries co-mingle shale oil produced by Defendants with other shale oil, as well as crude oil extracted from traditional drilling methods, then refine the crude oil into gasoline and other petroleum-based products.

5.      The resulting refined products, including gasoline, diesel, and jet fuels, are then transported to storage terminals, where they are stored and blended prior to sale to gas stations or "rack" fuel suppliers for onward sale to end users.

6.      Crude oil is a critical commodity for American consumers. Supply and demand dynamics drive pricing for crude oil, which is the reference commodity for some of the largest and most important futures and derivative markets in today's economy, including the market for WTI futures contracts traded on the Chicago Mercantile Exchange ("CME").

7.      Crude oil supply is measured by the number of barrels (abbreviated as "bb1") produced. Each barrel contains 42 gallons of crude oil.  Daily oil production is measured in barrels per day (abbreviated as "bpd," "b/d," or "B/D").  Production over longer periods is often measured in millions of barrels (abbreviated as "MMbbl").

8.      Globally, crude oil has three main pricing benchmarks: West Texas Intermediate, Brent, and Dubai Crude. WTI is considered a high-quality oil that is relatively easy to refine. It is also known as a light sweet oil because it has low sulfur content and low density. WTI delivered to the hub in Cushing, Oklahoma serves as the main futures and physical pricing benchmark in the United States domestic crude oil market. Shale oil produced in the southwestern United States in

---

[1] "The U.S. Energy Information Administration (EIA) estimates that in 2023, approximately 3.04 billion barrels (or about 8.32 million barrels per day) of crude oil were produced directly from tight-oil resources in the United States. This was equal to about 64% of total U.S. crude oil production in 2023." *How much shale (tight) oil is produced in the United States?*, U.S. ENERGY INFO. ADMIN. (last updated Mar. 28, 2024), https://www.eia.gov/tools/faqs/faq.php?id=847&t=6.

the Permian region (among others) is directly connected through pipelines and regional proximity to the crude oil market in Cushing, Oklahoma.

9.      U.S. independent shale producers ("Independents"), including Defendants, are companies that primarily focus on the exploration, development, and production of domestic shale resources. These companies are distinct from large vertically integrated energy companies like Chevron Corporation ("Chevron") and ExxonMobil Corporation ("ExxonMobil"), also known as "supermajors," which have diverse global operations encompassing the exploration, production, refining, and distribution of various energy resources. For example, in 2019, only 7% of Chevron's total global crude oil produced was from U.S. shale operations.[2]

10.      To generate growth and benefit from consolidation, select supermajors and large independents have acquired, or shown interest in acquiring, independent shale producers. On May 3, 2024, ExxonMobil completed an acquisition of Pioneer Natural Resources Company, a named Defendant. Pioneer Natural Resources Company is now a wholly owned subsidiary of ExxonMobil. On October 23, 2023, Chevron announced entering into a definitive agreement to purchase all outstanding shares of Hess Corporation, a named Defendant. Diamondback Energy, Inc., a named Defendant, also announced an acquisition of Endeavor Energy Resources, L.P. on February 12, 2024. As major crude oil producers, acquirers of independent producers also benefit directly from the Defendants' manipulation of WTI physical and futures prices and should be incorporated as Defendants as appropriate.

---

[2] *Chevron to Boost Permian Oil Production as Demand for Reliable Energy Grows*, CHEVRON NEWSROOM (June 16, 2022) (stating that Chevron produced 220,000 barrels of U.S. shale oil per day in 2019), https://www.chevron.com/newsroom/2022/q2/chevron-to-boost-permian-oil-production-as-demand-for-reliable-energy-grows; *2019 Supplement to the Annual Report*, CHEVRON CORP. (2020), at 11 (stating that Chevron's total 2019 production was 3,058,000 barrels of oil equivalents per day), https://www.chevron.com/-/media/shared media/documents/annual-report-supplement-2019.pdf.

11.     Defendants are among the largest Independents. Independents grew into an important "swing producer" role for oil markets, with the ability to adjust shale oil production levels rapidly in response to changes in market conditions and push, or "swing," the price of crude oil. The Organization of the Petroleum Exporting Countries ("OPEC") acts as another important "swing" producer within oil markets. Participating countries, particularly Saudi Arabia, are able to leverage significant spare production capacity to respond to market fluctuations more flexibly than many other oil-producing entities. The conduct of these swing producers has a direct impact on the price of WTI crude oil and related futures contracts.

12.     The CME offers WTI crude oil futures contracts as a price discovery tool to "provide direct crude oil exposure," to traders seeking "the most efficient way to trade oil after a sharp rise in US crude oil production" and "hedge against adverse oil price moves."[3] Cushing, Oklahoma is the main physical delivery point for oil under the CME listed WTI futures contract, and each WTI futures contract represents one thousand barrels of crude oil to be delivered at Cushing. Price signals in WTI futures reflect supply and demand dynamics in physical markets, such that prices of WTI futures contracts are directly linked to the price of crude oil at the WTI, Cushing hub.[4] At expiry of the WTI crude oil futures contract, the physical and financial price of the futures converge as the WTI contract is ultimately settled by the delivery of physical WTI oil

---

[3] *See Crude Oil Futures and Options, Crude Oil*, CME GROUP (last accessed Apr. 7, 2025) ("When traders need the current oil price, they check the WTI Crude Oil price."), https://www.cmegroup.com/markets/energy/crude-oil/light-sweet-crude.contractSpecs.html.

[4] Daniel Brusstar and Russell Karas, *Why Cushing Matters: An Update on the WTI Benchmark*, CME GROUP (Mar. 21, 2023), https://www.cmegroup.com/education/articles-and-reports/why-cushing-matters-a-look-at-the-wti-benchmark.html ("Our futures prices reflect the fundamentals in the physical crude oil market, declining in price and increasing in contango when global supply outstrips demand, and rising in price and backwardation when global supply is tight. WTI futures perform its critical function as the central clearing mechanism for buyers and sellers in the crude oil market, and provide a transparent, fair, and robust benchmark price.").

in Cushing. Shale oil from the Permian shale region (among others) is directly connected via pipeline and delivery mechanisms to the delivery point for WTI futures, Cushing, Oklahoma.

13.    In 1983, Cushing was selected as the location for physical settlement of WTI futures. It was already a vibrant hub for cash market trading of crude oil due to a network of pipelines, refineries, and storage terminals. Today, Cushing is a key nexus of market fundamentals for the global crude oil market with nearly two dozen pipelines and 20 storage terminals. Cushing's in-bound pipelines deliver crude oil streams produced in Canada and the U.S. shale oil areas, including the Bakken, Niobrara, and Permian producing areas, while its out-bound pipelines supply crude oil to the main refining centers in Petroleum Administration for Defense ("PADD") Districts 2 and 3. While Cushing has significant storage capacity, second only to the Gulf Coast, it is also concentrated geographically, facilitating physical markets and providing ready access to multiple storage options to facilitate physical trading of oil.[5] The physically concentrated nature of tankage within Cushing ensures that the price of a barrel at Cushing is consistent across the hub.[6]

14.    The strong connection between the WTI crude oil futures at delivery (i.e., when futures prices become spot) and the physical spot market provides a clear mechanism such that market components move towards price convergence *by design*. This price convergence happens near contract expiration and product settlement although all futures prices are related to spot prices. The prompt month or lead month NYMEX WTI Cushing contract provides the highest degree of price discovery and price certainty within the overall WTI market ecosystem. This is because the

---

[5] *Id.*

[6] *Id.*

contract is transparent, liquid (highest numbers of observable trades matching sellers and buyers), and very responsive to current and future market supply and demand signals.

15.     Other WTI crude oil derivatives, such as forwards and swaps, trade over the counter ("OTC") and similarly have a price linkage with both the spot market and WTI crude oil futures.

16.     Market activity related to the COVID-19 pandemic illustrates how futures markets are impacted by and ultimately converge with physical markets. In 2020, market signals in gasoline, or reformulated gasoline blend-stock for oxygenate blending ("RBOB"), began to reflect demand destruction from COVID-19 (*e.g.*, social distancing, quarantine, etc.). As a result, WTI futures prices, and cash prices for crude oil began to fall, while oil storage began to fill. Physical crude oil and WTI futures both traded lower in the extremes, and storage resources for physical WTI crude oil filled to capacity.

17.     Coming out of COVID-19, these signals reversed with the return of demand. Defendants colluded with each other and with OPEC to withhold production to maintain and enhance prices. Their doing so directly increased WTI futures prices because much of Cushing's inbound pipeline infrastructure is supplied from shale oil production areas where Defendants are the major "swing" producers.

18.     The price signal from the WTI crude oil futures market is particularly important because it is the deepest and most liquid market in the U.S. and provides futures price and contract mechanics relied upon by suppliers, refiners, and end users of crude oil products for important go-forward decision making and risk management over the short, medium, and long term.

19.     According to the U.S. Energy Information Administration ("EIA"), world oil prices tend to move together due to arbitrage. Arbitrage occurs from price signals that futures traders create as they closely follow OPEC production and production guidance, the Defendants'

production and production guidance, and other significant market inputs. Given the integrated nature of global oil markets, collusion among Defendants and collusion between Defendants and OPEC to increase and maintain high WTI prices is a tactic in-line with the OPEC cartel's goals of managing total production to achieve and maintain desired price level. To illustrate, in 2022, Defendants produced up to one quarter of all crude oil produced in the continental United States. A significant portion of this production is concentrated in "tight oil" production areas such as the Permian Basin, the Niobrara, and the Bakken. Over fifty percent of the inbound pipeline capacity into the WTI, Cushing settlement area is from these three production areas. As significant producers in these areas, Defendants had the ability to influence, and did in fact artificially influence, WTI crude oil physical and futures prices.

20.    Pricing dynamics at Cushing are also impacted by global markets. Import and export infrastructure on the Gulf Coast allows for opportunity to impact WTI prices at Cushing. Beginning in the early 2000s, significant offshore imports were included in midcontinent sweet crude runs, driven by demand expressed through Cushing WTI price signals, and by 2016 OPEC imports into the domestic U.S. market were at high water mark of over three million barrels per day. After the initiation of more formal communication among Defendants and between Defendants and OPEC, however, OPEC imports declined by two thirds to under one million barrels per day, and imports stayed at these lower levels despite significant price increases.[7]

21.    The collusive orchestration of a theme of "disciplined and managed production" through joint dinners at industry conferences, Defendant CEO pronouncements, and OPEC actions has directly impacted WTI futures prices.

---

[7] K.D. Miller, M.T. Chevalier, & J. Leavens, *The Role of WTI As a Crude Oil Benchmark*, PURVIN & GERTZ INC. (January 2010), prepared for the CME Group, https://www.bauer.uh.edu/spirrong/PurvinGertz_WTI_Benchmark_Study.pdf.

22.    The U.S. experienced record-high crude oil prices beginning around January 2021, with high prices continuing through the present. Basic supply and demand principles dictate that, in their role as swing producers, Defendants should have capitalized on the price increase by selling more barrels of oil at higher prices. Instead, Defendants collusively decided not to increase their U.S. shale oil production.

23.    Defendants' agreement was complemented by their collusion with OPEC, who also sought to raise oil prices through limiting oil production during the Class Period.

24.    Defendants met and communicated regularly with each other, and with OPEC, to coordinate their collective oil output in response to market conditions. Following these meetings, representatives from Defendants consistently made public statements confirming these discussions and the exchange of confidential information. Specifically, Defendants confirmed that they discussed with each other and with OPEC their production strategies, future investment plans, and price targets. Likewise, when publicly discussing their meetings with Defendants, OPEC officials praised the cooperative nature of their developing relationship with Defendants. Beginning on or around 2021, Defendants' conduct was in violation of U.S. legal prohibitions on price-fixing and market manipulation.

25.    From the time when the meetings between U.S. shale producers and OPEC began in 2017 until the COVID-19 pandemic's onset, worldwide oil prices and supply remained relatively stable. In the COVID-19 pandemic's early days, gasoline demand dropped precipitously, sending a shock through the oil supply chain.

26.    Demand for refined products, such as gasoline, and thereby oil prices, recovered and ultimately increased at a rapid rate in 2021. The crude oil price increase following COVID-19 was exacerbated by the Russian invasion of Ukraine in late February 2022, which led to sanctions

that largely sequestered Russian oil from the global market. This extended run of historically high crude oil prices provided prime market conditions for agile swing producers like Defendants to increase production.

27.    Defendants did not take advantage of this market opportunity. Departing from their historical practice and rational independent self-interest, each Defendant limited their domestic shale production growth. No Defendant would do this on its own, as competitors would take advantage of the market conditions and the ability to sell more oil at higher prices. Instead, Defendants, in collusion with each other, and in collusion with OPEC, agreed to constrain supply and raise prices, which would lead to higher profit margins.

28.    Defendants' agreement to limit their respective shale production volumes has had the effect of fixing and/or stabilizing at an artificially high-level U.S. crude oil prices, which includes the price of key commodities futures contracts (e.g., WTI futures contracts), financial instruments that are designed to mitigate price uncertainty.

29.    Defendants' cartel is a *per se* unlawful restraint. Plaintiff and Class members were active participants in futures markets and suffered substantial harm from the supracompetitive and artificial prices they paid which were directly distorted by the cartel's efforts to constrain domestic production of shale oil in the United States. They bring this suit to recover that loss.

## PARTIES

### I.    Plaintiff

30.    Plaintiff 3Red is a limited liability corporation with its principal place of business in Chicago, Illinois. During the Class Period, Plaintiff traded crude oil futures contracts, the prices of which are directly linked to WTI crude oil. Plaintiff traded thousands of contracts each week during the Class Period. Plaintiff traded these contracts at artificial prices directly and proximately caused by the Defendants' price-fixing and manipulation. As a direct result, Plaintiff was deprived

of transacting in a lawful, non-manipulated market in WTI futures, and suffered actual damages by transacting in WTI crude oil futures at artificial prices caused by Defendants.

## II.    Defendants

31.    **Defendant Permian Resources Corporation** ("Permian Resources"), formerly known as Centennial Resource Development, Inc. ("Centennial"), is a Delaware corporation headquartered in Midland, Texas. Permian Resources' common stock is listed and traded on the New York Stock Exchange under the trading symbol PR. Permian Resources is an oil and gas production company that acquires and processes shale oil in Texas and New Mexico, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country. During the Class Period, Defendant Permian Resources had significant exposure to WTI pricing. Specifically, Defendant Permian Resources traded significant numbers of NYMEX crude oil swaps, options, collars, basis protection, and differentials, creating a direct benefit to Defendant from higher WTI, Cushing prices as swap counterparties rely on publicly available benchmark pricing information as well as futures and options liquidity available on the NYMEX exchange to establish WTI swap pricing. Supracompetitive prices on NYMEX and at WTI, Cushing directly benefited Defendant Permian Resources' hedging strategy using swaps as a result of the ongoing manipulation during the Class Period.

32.    **Defendant Chesapeake Energy Corporation** ("Chesapeake Energy") is now known as Expand Energy Corporation ("Expand Energy"), after a merger between Chesapeake Energy and Southwestern Energy Company finalized on October 1, 2024. Like Chesapeake Energy, Expand Energy is an Oklahoma corporation headquartered in Oklahoma City, Oklahoma. Expand Energy's common stock is listed and traded on the NASDAQ Stock Market under the trading symbol EXE. During the Class Period, Chesapeake Energy produced shale oil in Louisiana, Pennsylvania, and Texas for sale in the U.S. During the Class Period, Defendant

Chesapeake Energy had significant exposure to WTI pricing. Specifically, Defendant Chesapeake Energy traded significant numbers of NYMEX crude oil swaps, options, basis protection, and differentials, creating a direct benefit to Defendant from higher WTI, Cushing prices.

33.     **Defendant Continental Resources Inc.** ("Continental") is an Oklahoma corporation headquartered in Oklahoma City, Oklahoma. Continental common stock was listed and traded on the New York Stock Exchange under the trading symbol CLR until the purchase of the company by its founder Harold Hamm on November 22, 2022, through a series of take-private transactions with Omega Acquisition Inc. Continental is an oil and gas company that acquires and processes shale oil in North Dakota, Montana, Oklahoma, Texas, and Wyoming, before selling the resulting shale oil into the U.S. domestic market. During the Class Period, Defendant Continental had significant exposure to WTI pricing. Specifically, Defendant Continental traded significant numbers of NYMEX crude oil swaps, creating a direct benefit to Defendant from higher WTI, Cushing prices.

34.     **Defendant Diamondback Energy, Inc.** ("Diamondback") is a Delaware corporation headquartered in Midland, Texas. Diamondback's common stock is listed and traded on the NASDAQ Stock Market under the trading symbol FANG. Diamondback is an oil and gas production company that acquires and processes shale oil in Texas, before selling the resulting shale oil into the U.S. domestic market. During the Class Period, Defendant Diamondback had significant exposure to WTI pricing. Specifically, Defendant Diamondback traded significant numbers of NYMEX crude oil swaps, creating a direct benefit to Defendant from higher WTI, Cushing prices.

35.     **Defendant EOG Resources, Inc.** ("EOG") is a Delaware Corporation headquartered in Houston, Texas. EOG's common stock is listed and traded on the New York Stock

Exchange under the trading symbol EOG. EOG is an oil and gas production company that acquires and processes shale oil in North Dakota, Wyoming, Colorado, Oklahoma, Texas, New York, Pennsylvania, and New Mexico, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country. During the Class Period, Defendant EOG had significant exposure to WTI pricing. Specifically, Defendant EOG traded significant numbers of NYMEX crude oil swaps, creating a direct benefit to Defendant from higher WTI, Cushing prices.

36.    **Defendant Hess Corporation** ("Hess") is a Delaware corporation headquartered in New York, New York. Hess's common stock is listed and traded on the New York Stock Exchange under the trading symbol HES. Hess is an oil and gas production company that acquires and processes shale oil in North Dakota, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country. Hess also sells refined consumer gasoline across the United States. On October 23, 2023, Chevron Corporation announced that it had entered into a definitive agreement to purchase all outstanding shares of Hess. The close of the agreement is delayed due to an arbitration challenge from Exxon and CNOOC Ltd. During the Class Period, Defendant Hess had significant exposure to WTI pricing, including futures and swaps.

37.    **Defendant Occidental Petroleum Corporation** ("Occidental") is a Delaware corporation headquartered in Houston, Texas. Occidental's common stock and warrants to purchase common stock are listed and traded on the New York Stock Exchange under the trading symbols OXY and OXY WS, respectively. Occidental is an oil and gas production company that acquires and processes shale oil in Colorado, Texas, and New Mexico, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country.

During the Class Period, Defendant Occidental had significant exposure to WTI pricing, including futures and swaps.

38.    **Defendant Pioneer Natural Resources Company** ("Pioneer") is a Delaware corporation headquartered in Irving, Texas. Pioneer's common stock was listed and traded on the New York Stock Exchange under the trading symbol PDX prior to its acquisition by ExxonMobil in 2024. Pioneer is an oil and gas production company that acquires and processes shale oil in Texas, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country. Pioneer's SEC annual report filings during the Class Period note that the Company's oil production is tied directly to, or is highly correlated with, NYMEX WTI oil prices and that the Company uses derivative contracts to manage oil price volatility and basis swap contracts to reduce basis risks. During the Class Period, Defendant Pioneer had significant exposure to WTI pricing, including futures and swaps. Specifically, Defendant Pioneer traded significant numbers of NYMEX crude oil swaps, options, collars, basis protection, and differentials, creating a direct benefit to Defendant from higher WTI, Cushing prices. Pioneer was purchased by ExxonMobil in a transaction that closed on May 3, 2024 and is now a wholly owned subsidiary of ExxonMobil.

39.    **Defendant Scott D. Sheffield** ("Sheffield") is a resident of Texas and the founder of Defendant Pioneer.  Defendant Sheffield was the Chief Executive Officer ("CEO") of Defendant Pioneer during all times relevant to this Complaint, until his retirement at the end of 2023. Defendant Sheffield remained on Pioneer's Board of Directors until at least the merger between Defendant Pioneer and ExxonMobil in announced in October 2023, discussed further below.

40.    **Defendant John B. Hess** ("John Hess") is a New York resident and has been the CEO of Defendant Hess since 1995 and has served as CEO during all times relevant to this Complaint.

41.    "Defendants," as used herein, refers to and includes each of the named Defendants' predecessors, successors, parents, wholly-owned or controlled subsidiaries or affiliates, employees, officers, or agents. "Individual Defendants," as used herein, refers to Defendants Sheffield and John Hess.

42.    **John Doe Defendants Nos. 1-60** ("John Doe Defendants") are other unknown corporations, individuals, and entities that willingly conspired with Defendants in their unlawful and illegal conduct. Numerous individuals and entities participated actively during the course of, and in furtherance of, the scheme described herein.

43.    Each Defendant was a co-conspirator with the other Defendants and committed overt acts in furtherance of the conspiracy alleged herein in the United States and in this District.

44.    During the Class Period, each Defendant profited from the sale of shale oil drilled and sold in the United States, or in the case of the Individual Defendants, from their employer's sale of shale oil drilled and sold in the United States.

45.    During the Class Period, at least Defendants Permian, Chesapeake, Continental, Diamondback, EOG, Hess, Occidental, and Pioneer, aided and abetted by Individual Defendants Sheffield and John Hess, exploited their position as global marginal producers by agreeing to curtail their respective crude oil production to keep U.S. and global crude oil prices artificially high.

46.    Where Plaintiff ascribes an action to "Defendants," unless stated otherwise, the action is alleged to have been taken by each of Centennial, Chesapeake, Continental,

Diamondback, EOG, Hess, Occidental, and Pioneer, aided and abetted by Individual Defendants Sheffield and John Hess.

## III.    Agents and Co-Conspirators

47.    Other unnamed co-conspirators include the members of OPEC and OPEC+ (defined below), as well as any other currently unknown U.S. shale producers that committed overt acts in furtherance of the conspiracy alleged herein.

48.    Various other entities and individuals unknown to Plaintiff at this time participated as co-conspirators in the acts complained of, and performed acts and aided and abetted the unlawful conduct alleged herein. Plaintiff reserves the right to identify other co-conspirators and to name subsequently some or all co-conspirators, whether identified here or not, as defendants.

49.    Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint. Each Defendant acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein in the United States and in this District.

50.    Defendants are also liable for acts done in furtherance of the alleged conspiracy by their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions.

51.    Whenever reference is made to any act of any organization, corporation, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, partners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

## JURISDICTION AND VENUE

52.    This action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), and Sections 2(a), 6(c) and 22 of the Commodity

Exchange Act (7 U.S.C. § 2(a), et seq.), and Regulation 180.2, 17 C.F.R. § 180.2. The action is for injunctive relief, compensatory damages, treble damages, costs of suit, and reasonable attorneys' fees.

53.    This Court has federal question subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1337, Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), and Section 22 of the Commodity Exchange Act (7 U.S.C. § 25). This Court has subject matter jurisdiction over Plaintiff's claim under Section 16 of the Clayton Act, 15 U.S.C. § 26, and under 28 U.S.C. §§ 1331, 1332(d), 1337(a), and 1367.

54.    Venue is proper in this District under Section 22 of the CEA, 7 U.S.C. § 25(c), the Clayton Act, 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b), (c), and (d) because at all times relevant to the Complaint: (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in this District; (b) Defendants manufactured, sold, shipped, and/or delivered substantial quantities of shale oil throughout the United States, including this District; (c) Defendants have substantial contacts with the United States, including this District; (d) Defendants engaged in an antitrust conspiracy and manipulation that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District; and (e) a substantial portion of the conduct alleged in this Complaint occurred in, or directly affected shale oil production in, the Permian Basin, which spans Southeastern New Mexico and West Texas.

55.    During the Class Period, all Defendants (domestic and foreign) engaged in conduct within the United States that is directly related to Plaintiff's allegations. Defendants' misconduct was purposefully directed at the United States and was specifically intended to affect crude oil,

WTI crude oil futures, and WTI-based derivative prices in the United States. Defendants' acts were acts in furtherance of the conspiracy. Because they occurred in the United States, including by Defendants' domestic entities, specific personal jurisdiction exists over all Defendants and their conspirators.

56.     The conspiracy and the overt acts taken in furtherance of the conspiracy, were directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District.

## FACTUAL ALLEGATIONS

### I.    Glossary of Key Terms

57.     "Backwardation" refers to market conditions in which the price of a commodity for nearby delivery is higher than for the more deferred deliveries.

58.     "Collar" refers to a trading strategy consisting of a long futures contract, a short call, and a long put. The call and put are different strikes but have the same expiration and the same underlying futures contract. Traders use collars to protect against downside risk of the futures contract. The long-put leg provides protection against downside market movements while the premium received from shorting the call helps finance the purchase of the put.

59.     "Contango" refers to market conditions where the price of a commodity for nearby delivery is lower than for more deferred deliveries.

60.     "Differential" refers to the discount or premium between a given WTI market price and the flat or spot WTI physical price.

61.     "Options" refer to contracts that give the bearer the right, but not the obligation, to be long or short a futures contract at a specified price within a specified time period. The specified price is called the "strike price." A "call option" means that the purchaser pays a premium and acquires the right, but not the obligation, to purchase a specified futures contract at the strike price

on or prior to expiration, while a "put option" provides the purchaser the right, but not the obligation, to sell a futures contract at the strike price at any time during the life of the option.

62.    "Swaps" are customized, over-the-counter derivative agreements allowing two parties to exchange cash flows based on the price of WTI, especially WTI physical prices, frequently employed as a tool for hedging price risk. A common structure is the fixed-for-floating swap, where one party agrees to pay a fixed price, and the other pays a variable price tied to a WTI benchmark.

63.    "WTI physical" or "physical crude oil" refers to crude oil eligible for physical delivery under the New York Mercantile Exchange ("NYMEX") Light Sweet Crude Oil futures contract as defined in NYMEX Rulebook Chapter 200.[8]

64.    "WTI crude oil futures" or "WTI futures" means the CME Group West Texas Intermediate Light Sweet Crude Oil futures traded on NYMEX[9] or Intercontinental Exchange ("ICE"). When WTI crude oil futures contracts come due, they become WTI spot physical prices.

## II.    WTI Futures Contracts, West Texas Intermediate Physical Crude Oil, and Other Closely Related Derivative Products.

65.    Futures contracts are standardized, exchange-traded, derivative contracts. WTI crude oil futures contracts have traded on the NYMEX, now part of CME Group, since 1983. The WTI crude oil futures contract is one of the most important commodities futures contracts globally and plays a vital role in price discovery. Trading in futures allows users and suppliers of crude oil or commodities with crude oil linkages to hedge against physical crude oil price fluctuations. The

---

[8]    *See* CME Rulebook Chapter 200 Light Sweet Crude Oil Futures, CME GROUP, https://www.cmegroup.com/rulebook/NYMEX/2/200.pdf (last visited Apr. 15, 2025).

[9] *Id.*

NYMEX WTI crude oil futures contract is the most liquid oil contract traded globally, with over one million contracts traded daily and approximately four million contracts of open interest.

66.     Cushing, Oklahoma was chosen as the physical settlement location for WTI crude oil futures contracts due to significant physical oil trading facilitated by the infrastructure located in and around Cushing. A commercial company that elects to take delivery after the expiration of the WTI futures contract must have storage and/or pipeline capacity connected to one of the NYMEX delivery locations in Cushing. From there, the firm can elect to take the oil into storage or into a pipeline with connectivity to PADD District 2 refineries and to the Gulf Coast market. The physical-delivery requirement of WTI futures provides a direct link to the underlying physical market, and futures also provide the security of a financially guaranteed clearinghouse for buyers and sellers.

67.     Prices of Cushing WTI physical oil and WTI futures contracts, particularly the front month futures contract price, are highly correlated. Manipulation of physical prices directly impacts WTI futures because futures prices "reflect the fundamentals in the physical crude oil market, declining in price and increasing in contango when global supply outstrips demand, and rising in price and backwardation when global supply is tight. WTI futures perform its critical function as the central clearing mechanism for buyers and sellers in the crude oil market, and provide a transparent, fair, and robust benchmark price."[10]

68.     The WTI Cushing convergence mechanism underscores the fundamental link between the paper trading of futures contracts and crude oil as a physical commodity. The alleged coordinated reduction in volumes provided Defendants with the fulcrum to move the WTI complex in their favor. When WTI prices increase and remain elevated, Defendants benefit by being able

---

[10] *See* Brusstar and Karas, *supra* n.4.

to sell their product at a higher price either at the point of physical delivery, often at a differential priced using WTI, or to lock in a future price for their product using a WTI related hedge product such as a swap, option, or futures contract.

69.     WTI OTC physical transactions and WTI OTC swaps are also important components of the market for WTI crude oil. Swaps represent a substitute for the futures contracts but rely on NYMEX pricing to establish the financial arrangement for the swap contract. During the Relevant Period, Defendants used swaps, among other derivatives, to hedge against pricing fluctuations in the crude oil market.

70.     WTI OTC swaps often reference WTI futures pricing for settlement, particularly the prompt or lead month contract, as WTI-Cushing is the fundamental crude oil price benchmark providing both observability, standardization and liquidity. OTC swap providers and dealers (the other leg of a swap contract) often turn to the more liquid futures market to hedge their own exposure to WTI price risk. The deep liquidity and the continuous price discovery process of the futures market, flowing outward from high volume prompt and lead month trading activity, provides a reliable and widely accepted foundation for transactions occurring in the less transparent OTC market.

71.     One or more Defendants note in their SEC filings that the value of their oil production is directly linked to, or are highly correlated with, WTI pricing.[11] Collectively, Defendants' production decisions impact WTI benchmark futures and spot prices.

72.     As a result of the high correlation between the physical and futures markets,

---

[11] *See* Pioneer Natural Resources Company, Annual Report 2021 (Form 10-K), at 94 ("The Company sells its oil production at the lease and the sales contracts governing such oil production are tied directly to, or are correlated with, NYMEX WTI oil prices."), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001038357/fb196788-0658-4930-a6d4-8537ff785aaa.pdf.

refiners, airlines, haulers, commodity traders, shippers, and other commodity market participants, as well as investors, utilize WTI and derivatives dependent on WTI (e.g., swaps and differentials), as well as other instruments such as Brent futures and options on futures to manage crude oil price risk. A general trend toward greater awareness of risk management has also contributed to the growth in the popularity of the WTI contract with firms using a futures position as a form of "price insurance" to avoid downside risks if they are a producer, or upside risks (cost exposure) if they are a consumer.

### III.    Organization of the Petroleum Exporting Countries ("OPEC")

73.    OPEC is an intergovernmental organization made up of nations who purport to benefit from sovereign immunity from the Sherman Act.[12] OPEC controls approximately 40% of the world's oil production. Historically, OPEC exerted market power over global oil prices by coordinating its members' respective production levels.[13] Non-member nations historically keyed their oil production levels off OPEC guidance to benefit from the oil prices targeted by OPEC; a classic "umbrella pricing" situation.[14]

74.    Historically, Saudi Arabia acted as OPEC's (and thereby the global) "swing producer." Swing producers are known for their ability to adjust production levels relatively

---

[12] Mamdouh G. Salameh, *OPEC is an Important Energy Policy Tool to Keep Oil Markets Stable*, 28 I.A.E.E. ENERGY FORUM 17 (Int'l Ass'n for Energy Econ.) (Feb. 2019), at 17 (OPEC's stated mission is to "'coordinate and unify the oil policies of its member countries and ensure the stabilization of oil markets. . . .' The organization is also a significant provider of information about the international oil market. The current OPEC members are Algeria, Angola, Ecuador, Equatorial Guinea, Gabon, Iran, Iraq, Kuwait, Libya, Nigeria, Qatar, the Republic of Congo, Saudi Arabia (the de facto leader), UAE and Venezuela."), https://www.iaee.org/documents/2019EnergyForum1qtr.pdf.

[13] Anshu Siripurapu and Andrew Chatzky, *OPEC in a Changing World*, COUNCIL ON FOREIGN RELS. (Mar. 9, 2022), https://www.cfr.org/backgrounder/opec-changing-world.

[14] *See* Salameh, *supra* n.12 ("In the 1980s, OPEC began setting production quotas for its member nations; generally, when the quotas are reduced, oil prices increase. . . .Since the 1980s, representatives from Egypt, Mexico, Norway, Oman, and Russia and other oil-exporting nations have attended many OPEC meetings as observers. This arrangement serves as an informal mechanism for coordinating policies.").

rapidly in response to changes in market conditions and influence crude oil prices. Saudia Arabia leveraged its status as the member with the largest production capacity to become OPEC's de facto leader.[15]

75.    In December 2016, OPEC expanded its cartel, signing the first of several agreements with 10 other oil-producing nations (most notably Russia, whose production rivaled that of Saudi Arabia), forming what is now known as "OPEC+."[16]

76.    This long-resisted expansion of OPEC was done out of necessity, in reaction to growing U.S. crude oil production.[17] By 2014, OPEC lost its ability to exert complete control over global oil prices. The U.S.-based shale oil swing producers, sometimes referred to as "Cowboyistan," emerged as a new set of global oil price influencers.

## IV.    U.S. Independents Alter Supply Dynamics

77.    Fracking dramatically increased U.S. crude oil production and altered the global crude oil markets. Within eight years of the first commercial shale operation coming online in Texas in 2002, U.S. shale producers were producing enough shale oil to reverse a thirty-five-year trend of declining domestic crude oil production. The seven years starting from 2008 represented

---

[15] *Id.*

[16] *Id.* at 18 (In 2017, "Saudi Arabia was forced to eventually discard its [price war with U.S. Independents] strategy and engineer with Russia an OPEC/non-OPEC production cut agreement" in an attempt to regain control of crude oil prices. The agreement was extended through 2018 and converted into a "permanent mechanism for cooperation between OPEC and Russia in what has been dubbed as OPEC+."). Throughout this Complaint, references to OPEC from December 2016 onwards encompass OPEC+.

[17] Guy Laron, *The OPEC+ Puzzle: Why Russian-Saudi Cooperation Starts – and Stops – with Oil Prices*, THE WILSON CENTER (Jan. 19, 2023) (stating that despite decades of tension and bad blood between Russia and Saudi Arabia, "[t]here was no way for OPEC to deal with the growing market power of the US without cooperating with the Russians"), https://www.wilsoncenter.org/article/opec-puzzle-why-russian-saudi-cooperation-starts-and-stops-oil-prices; *see also* Harry First & Darren Bush, *The U.S. Can Take on the Oil Cartel that Enables Putin, and Win*, THE N.Y. TIMES (June 3, 2022), https://www.nytimes.com/2022/06/03/opinion/gas-prices-russia-opec.html.

the fastest increase in domestic crude oil production in U.S. history and is sometimes referred to as the "Shale Revolution."[18]

78.    Shale production posed a unique challenge for OPEC. The traditional supermajors typically invest in decades-long traditional drilling projects that require substantial lead time and infrastructure construction before production begins and thus expect consistent production thereafter. By contrast, shale oil wells: (a) require smaller capital commitments; (b) can be drilled in two to four weeks;[19] (c) can be brought online within months; and (d) allow for production to be comparatively front-loaded. As a result, shale well producers can be more responsive to changing prices and real-time market conditions than the traditional supermajors. According to market analysts, "the shale sector's ability to boost production—and to scale back—relatively quickly is its calling card,"[20] which makes U.S. shale oil, "as close to inventory-on-demand as oil ever comes."[21] This unique ability to respond to price signals gave Defendants the ability to raise prices through production cuts, particularly when colluding with each other.

79.    Independents are like the supermajors in one important respect that is problematic for OPEC: they are subject to the Sherman Act. This means that while U.S. shale producers would

---

[18] Robert Rapier, *How The Shale Boom Turned the World Upside Down*, FORBES (Apr. 21, 2017), https://www.forbes.com/sites/rrapier/2017/04/21/how-the-shale-boom-turned-the-world-upside-down/?sh=497a463b77d2.

[19] Ryan Moore, *The Numbers: The Permian Excels*, PHEASANT ENERGY (last updated Sept. 7, 2023) (Defendant Pioneer, the largest acreage holder in the Midland Basin of the Permian, reported that as of 2018, it was taking Pioneer approximately 15 to 20 days to drill a well down 10,000 feet and horizontal out to 20,000 feet), https://www.pheasantenergy.com/the-numbers-the-permian-excels.

[20] Liam Denning, *Shale Companies Say They Can't Drill More. Even When There's a War?*, BLOOMBERG (Feb. 28, 2022), https://www.bloomberg.com/opinion/articles/2022-02-28/shale- companies-say-they-can-t-drill-more-even-when-there-s-a-war.

[21] Steve LeVine, *Oil Hasn't Bottomed Out, So Trade Now at Your Own Peril*, QUARTZ (Feb. 10, 2015), https://qz.com/341884/oil-hasnt-bottomed-out-so-trade-now-at-your-own-peril.

come to produce as much oil as the largest OPEC and OPEC+ nations,[22] it was not a monolith capable of making industry-wide production decisions. Rather, U.S. shale producers were a group of relatively smaller producers, bound by law to compete with each other, and with OPEC.

80.    U.S. shale's arrival on the global oil scene in the early-to-mid-2010s was a challenge to OPEC. The U.S. shale movement was dubbed "Cowboyistan"[23] in the industry for Independents' "drill-first, ask-questions-later" business model.[24] A "new oil order" had emerged.[25] The aggressive competition of U.S. shale producers began to usurp the Saudi swing producer role,[26] and U.S. domestic production began to erode OPEC-set cartel price premiums.

## V.    OPEC Reacts to Shale Oil Production

81.    As sovereign nation-states with GDPs (and, in some cases, currencies) heavily reliant on crude oil prices, OPEC was not willing to cede the pricing power OPEC had held over global oil prices for a half-century to the U.S. tight oil producers.

---

[22] By 2018, the United States eclipsed Saudi Arabia and Russia as the largest oil producer in the world. *See* Devin Krishna Kumar, *U.S. Expected to End 2018 as World's Top Oil Producer: EIA*, REUTERS (Dec. 11, 2018), https://www.reuters.com/article/us-usa-oil-eia-outlook/u-s-expected-to-end-2018-as-worlds-top-oil-producer-eia-idUSKBN1OA21D.

[23] Christopher Helman, *Welcome to Cowboyistan: Fracking King Harold Hamm's Plan for U.S. Domination of Global Oil*, FORBES (Mar. 9, 2015), https://www.forbes.com/sites/christopherhelman/2015/03/09/welcome-to-cowboyistan-fracking-king-harold-hamms-plan-for-u-s-domination-of-global-oil/?sh=bc9df884ed2.

[24] Barney Jopson, *Fracking: The Energy Revolution That Shook the World*, FIN. TIMES (May 6, 2015), https://www.ft.com/content/6fab1192-f30d-11e4-a979-00144feab7de.

[25] Derek Brower and Myles McCormick, *What the End of the US Shale Revolution Would Mean for the World*, FIN. TIMES (Jan. 15, 2023), https://www.ft.com/content/60747b3b-e6ea-47c0-938d-af515816d0f1.

[26] Hailey Lee, *Why OPEC's Losing Its Ability to Set Oil Prices*, CNBC (Oct. 27, 2014) (U.S. shale's spare capacity – the amount of crude a country is able to produce in 30 days in case of an emergency – was almost four times that of Saudi Arabia's), https://www.cnbc.com/2014/10/27/us-shale-replaces-opec-as-leading-swing-producer-goldman.html; *see also* David Livingston and Eugene Tan, *Shale's True Contribution to the Oil Market*, CARNEGIE ENDOWMENT FOR INT'L PEACE (July 9, 2015) ("consensus has developed that Saudi Arabia has surrendered its role as de facto manager of the world oil market to U.S. shale oil producers" because "shale wells take less time to drill and complete than comparatively larger conventional oil projects, which require years and many millions of dollars to move from planning into first production"), https://carnegieendowment.org/2015/07/09/shale-s-true-contribution-to-oil-market-pub-60659.

82.    At some point in 2014, OPEC determined it was in its best interests to reduce the impact of shale oil.

83.    Consequently, despite a global oversupply of crude oil, in mid-2014 OPEC made a deliberate long-term choice to maintain, rather than reduce, its production levels to win back the market share it had lost to Independents, and to push oil prices to a level that would render U.S. shale oil no longer economically viable.[27] This two-year period of open global competition, from 2014 through 2016, dubbed within the industry as the "OPEC Price War," had begun. The daily spot prices of crude oil between 2014 and 2016 are depicted in Figure 1 below.

**Figure 1. Daily Crude Oil Spot Prices (2010-2016)[28]**

---

[27] Siripurapu and Chatzky, *supra* n.13; *see also* Javier Blas, *Wall Street is Finally Going to Make Money Off the Permian*, BLOOMBERG (Apr. 24, 2023) (In February 2016, Saudi Arabia's Oil Minister Al-Naimi warned U.S. shale producers, "[l]ower costs, borrow cash, or liquidate."), https://www.bloomberg.com/opinion/articles/2023-04-24/higher-oil-prices-means-wall-street-s-shale-investments-will-finally-pay- off#xj4y7vzkg.

[28] Graph showing daily crude oil spot prices from 2010-2016, U.S. ENERGY INFORMATION ADMINISTRATION, *Crude Oil Prices Increased in 2016, Still Below 2015 Averages*, https://www.eia.gov/todayinenergy/detail.php?id=29412 (accessed July 22, 2024).



Daily crude oil spot prices, 2010-16
dollars per barrel

Source: U.S. Energy Information Administration, based on Thompson Reuters

84.    The OPEC Price War dragged on for years for two reasons. First, shale production

was a brand-new industry where technological advancements and accumulating experience were

driving breakeven points lower,[29] allowing Independents to exploit less productive shale fields

profitably.[30] Second, the U.S. legal structure (including corporate and bankruptcy law) encourages

---

[29] In the beginning of 2014, "Rystad Energy estimated the average breakeven price for tight oil to be $82 per barrel," but by 2018, the average breakeven price reported had dropped to $47 per barrel, and by 2021, $37 per barrel. *See Rystad Energy: As Falling Costs Make New Oil Cheaper to Produce, Climate Policies May Fail Unless they Target Demand*, ROGTEC MAGAZINE (Nov. 17, 2021), https://www.rogtecmagazine.com/rystad-energy-as-falling-costs-make-new-oil-cheaper-to-produce-climate-policies-may-fail-unless-they-target-demand; *see also* Maitham A. Rodhan, *The Effect of US Shale Oil Production on Local and International Oil Markets*, 13 INT'L J. OF ENERGY ECONS. & POLICY 4 (July 2023) ("This continuous decrease in the break-even price of shale oil made the US shale oil industry more flexible to face fluctuations in oil prices" and "[d]espite the drop in prices from about 100 dollars a barrel in 2014 to 64 dollars in 2019, shale oil production has doubled by 100% during this period.").

[30] A shale oil "play" refers to a specific geographic area or region where shale formations contain significant amounts of oil that can be economically extracted. The top three shale oil plays in the U.S. are the Permian Basin in Texas and New Mexico (40% of all U.S. crude production in 2022), the Bakken Formation in North Dakota and Montana, and Eagle Ford in Texas. Technological advancements have made more shale oil plays economically viable over time.

business formation and risk-taking, making business failure less economically devastating to the individuals involved.

85.     As a result, by implementing cost-cutting measures and focusing on the most productive shale plays to remain competitive in the lower-price environment, many U.S. shale producers, including Defendants, continued to drill at consistent levels despite the price drop caused by OPEC's Price War.[31]

86.     Yet, the OPEC Price War consolidated the U.S. shale industry, causing dozens of smaller Independents to fail[32] and larger Independents, like Defendants, to rally together in the face of a shared adversary.

## VI.     OPEC Changes Tactics and Looks to Bring U.S. Shale to "the Table on Pricing"

87.     Weary after years of low prices,[33] OPEC changed tactics. First, as noted above, in December 2016, it struck a deal with ten non-OPEC oil producing nations to form OPEC+. Having brought one enormous potential competitor (Russia) into the fold, OPEC turned its attention to U.S. "swing" production.

88.     Unable to price the Independents out of the market, OPEC started a years-long campaign to work with Independents so that they would act in concert with cartel objectives.

---

[31] Steven Mufson, *Is the Oil World Big Enough for Two Swing Producers?*, THE WASH. POST (Sept. 29, 2016) (noting that "the companies in [the U.S. shale industry] are ready to add production every time the price starts creeping up" and attributing to Defendant Pioneer CEO Scott Sheffield a promise that if oil prices moved above $60 a barrel, the U.S. Shale industry would respond by ramping up production), https://www.washingtonpost.com/business/economy/is-the-oil-world-big-enough-for-two-swing-producers/2016/09/29/ce4e96f0-85f7-11e6-a3ef-f35afb41797f_story.html.

[32] Matt Egan, *OPEC Tried to Put This US Shale Oil Driller Out of Business. It 'Backfired'*, CNN BUSINESS (May 12, 2017), https://money.cnn.com/2017/05/12/investing/shale-oil-ceo-opec/index.html.

[33] Mufson, *supra* n.31 (as a result of the ongoing price war, OPEC "regained some market share and put a floor under prices. But its success has been slow, limited and remains fragile. And the price [$45-$55 a barrel at that time] is still half of where they'd like it to be.").

89.     Independents, too, were weary of the price war. As reported by MarketWatch on September 8, 2016, "Shale-oil baron [and Defendant Continental CEO] Harold Hamm thinks major crude-oil producers need to settle on a plan to stabilize oil prices sooner than later."[34] Hamm, "calling for a freeze of production . . . said it is 'high time' for Russia and the Organization of the Petroleum Exporting Countries [OPEC] to forge a pact that would put an end to slide in crude oil prices."[35] Hamm and Defendants had gained leverage and the respect of OPEC during the price war. Now, Hamm was signaling to OPEC that Continental and the other Defendants were willing to play ball with OPEC.

90.     Shortly thereafter, in early 2017, Defendants and members of OPEC began meeting and sharing dinners together.[36] Many of these meetings took place on the sidelines of the CERAWeek Conference, a global energy conference held annually in Houston, Texas.

91.     During the CERAWeek Conference running from March 6 to March 10, 2017, former Nigerian politician and then-OPEC General Secretary Mohammed Barkindo "dined with about two dozen U.S. shale executives on the sidelines of [the 2017] CERAWeek conference, including [Defendant] Scott Sheffield of [Defendant] Pioneer Natural Resources, Co., [Defendant] John Hess of [Defendant] Hess Corp., Robert Douglas Lawler of [Defendant] Chesapeake Energy Corp., and Tim Leach of Concho Resources Inc."[37] OPEC had purportedly never before met with

---

[34] Mark DeCambre, *Harold Hamm Says It Is 'High Time' for an OPEC Pact to Freeze Output*, MARKETWATCH (Sept. 8, 2016), https://www.marketwatch.com/story/trumps-potential-energy-czar-says-its-high-time-for-an-opec-pact-to-freeze-output-2016-09-08.

[35] *Id*.

[36] Liz Hampton, *As Oil Prices Soar, U.S. Shale, OPEC in No Rush to Resume Price War*, REUTERS (Mar. 10, 2022) (OPEC began hosting regular dinners and events in 2017 "to better understand private sources of financing that allowed new companies to emerge" and "[o]ver time, the dinners grew more collegial."), https://www.reuters.com/business/energy/ceraweek-oil-prices-soar-us-shale-opec-no-rush-resume-price-war-2022-03-10.

[37] Javier Blas and Grant Smith, *OPEC Head to Meet with U.S. Shale Producers for Dinner Next Week*,

U.S. shale producers,[38] leading to reporters describing the meeting as "unusual."[39] Meetings during the March 2017 CERAWeek Conference "opened a communication channel between the shale companies and OPEC countries."[40] Defendant Sheffield of Defendant Pioneer stated, "I'm seeing a series of meetings where OPEC is reaching out and spending more time with US independents than I have seen over my entire career."[41]

92.    Indeed, CERAWeek 2017 served as a channel for OPEC's Secretary General to "garner views and opinions from other senior oil industry executives" in "bi-lateral" meetings with shale executives, according to Defendant Hess's CEO, John Hess.[42] Following a dinner with OPEC officials, Defendant John Hess reported to Bloomberg, "It was a very good exchange of information and views about oil . . . I really commend the OPEC Secretary General for outreach. It was a good talk."[43] OPEC Secretary General Barkindo confirmed everyone was on the same page regarding the need to collectively work to achieve price stability following the meeting, because "no-one wants to see a repeat of 2015 and 2016."[44]

---

BLOOMBERG (Feb. 27, 2018), https://www.bloomberg.com/news/articles/2018-02-27/opec-head-to-meet-u-s-shale-oil-producers-for-dinner-next-week.

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] David Wethe, *Oil to Hit $40 if OPEC Fails to Expand Cuts, Pioneer Says*, BLOOMBERG (Mar. 7, 2017), https://www.bloomberg.com/news/articles/2017-03-07/pioneer-s-sheffield-sees-40-oil-if-opec-doesn-t-extend-cuts?embedded-checkout=true#xj4y7vzkg.

[42] *CERAWeek 2017: Encouragement & Engagement*, OPEC BULLETIN (Org. of the Petroleum Exporting Countries, Vienna, Austria) (Mar. and Apr. 2017), at 12, https://www.opec.org/opec_web/static_files_project/media/downloads/publications/OB%2003_04%202017.pdf.

[43] Javier Blas, *OPEC Said to Break Bread with Shale in Rare Show of Détente*, BLOOMBERG (Mar. 7, 2017), https://www.bloomberg.com/news/articles/2017-03-07/opec-said-to-break-bread-with-shale-in-rare-show-of-detente.

[44] OPEC BULLETIN, *supra* n.42, at 15.

93.     During CERAWeek 2017, OPEC and the U.S. shale producers "agreed in principle that the market should be better balanced and lower inventories would be beneficial to everyone. . . . [but] shale producers signaled they weren't ready to give up on the growth they see ahead," or at least not yet.[45] Shortly after the meeting, Saudi Arabia's Energy Minister Khalid Al-Falih warned U.S. shale producers that if they wanted to collaborate, there would be no "free rides" on OPEC production cuts, and they must be ready to pull their weight when the time comes.[46] In other words, OPEC told U.S. shale producers that OPEC expected Independents to work together and coordinate their production cuts alongside OPEC.

94.     Later that year, OPEC Secretary General Barkindo told reporters that Defendants were "beginning to ask questions about how to proceed [alongside OPEC] in a more responsible manner."[47] Barkindo explained that he understood, from a meeting with executives of Defendants Hess and Continental during the CERAWeek Conference, that "[t]here is a general understanding that this downturn [caused by the price war] was not in the interest of anybody" and "[a]s much as we felt the pinch so did they."[48]

95.     In February 2018, in discussing plans to meet with U.S. shale executives for the second year in a row at the upcoming March 2018 CERA Week conference in Houston, Barkindo explained, "[i]t's a fulfillment of our common desire to continue the dialogue as agreed last year on the sidelines of CERAWeek."[49] Barkindo explained that OPEC and the U.S. shale industry

---

[45] Blas, *supra* n.43.

[46] Ron Bousso, *Exclusive - Saudis Tell U.S. Oil: OPEC Won't Extend Cuts to Offset Shale - Sources*, REUTERS (Mar. 9, 2017), https://www.reuters.com/article/us-ceraweek-saudi-shale/exclusive-saudis-tell-u-s-oil-opec-wont-extend-cuts-to-offset-shale-sources-idUSKBN16G2TJ.

[47] Anjli Raval, *OPEC Secretary General: 'No Doubt' Oil Market is Re-Balancing*, FIN. TIMES (Oct. 19, 2017), https://www.ft.com/content/89ddcf13-f338-315a-99ba-366256c7266a.

[48] *Id.*

[49] Blas and Smith, *supra* n.37.

agreed at their first meeting in 2017 that they had a "shared responsibility" towards the oil markets.[50] The 2018 CERAWeek dinner between OPEC members and U.S. shale producers, including Defendants, was organized to "further explore the mechanic of achieving our common objective" of stable production volumes and prices, per Barkindo.[51]

96.     On March 5, 2018, OPEC officials met with U.S. shale executives at Houston's "The Grove" restaurant, during which Secretary General Barkindo gave a speech to dinner attendees. Afterwards, Defendant Pioneer's then-CEO Tim Dove summarized Barkindo's speech to a reporter as an exchange of OPEC's forward-looking views on the oil market: "his main message was that [OPEC] believe[s] very strongly that demand is going to be significant moving forward in terms of growth." Defendant Centennial's CEO, Mark Papa, described the speech as "a statement that everyone will work together to make sure the oil market is well-supplied and everyone is happy to be working together."[52]

97.     OPEC representatives, including Gabriel Mbaga Obiang Lima, Equatorial Guinea's petroleum minister, described the meeting between OPEC and U.S. shale executives as more than just general discussions, with the key takeaway being a shared commitment to exchange confidential production information: "The key thing is that information is shared about our projections; it really helps everybody . . . the important thing is to know how much they [U.S. shale] are investing and their projections because usually they have good statistics."[53] Lima

---

[50] *Id.*

[51] *Id.*

[52] Ernest Scheyder and Ron Bousso, *CERAWEEK-U.S. Shale and OPEC Share Steak in Uneasy Truce at Houston Dinner*, REUTERS (Mar. 7, 2018), https://www.reuters.com/article/ceraweek-energy-opec-shale/rpt-%20ceraweek-u-s-shale-and-opec-share-steak-in-uneasy-truce-at-houston-dinneridUKL2N1QP05R.

[53] *Id.*

explained that, by sharing this information, "[w]hat we are doing is avoiding volatility," or put another way—coordinating production decisions to impact the price of crude oil rather than allowing market forces to dictate outcomes.[54]

98.    Nigerian Oil Minister and OPEC representative Emmanuel Ibe Kachikwu agreed that it was time for U.S. shale to "take some responsibilities in terms of stability of oil prices."[55] Indeed, Secretary General Barkindo confirmed that OPEC and the U.S. shale executives "had a very open, frank and lively conversations on the current state of the cycle and we also compared notes from our experiences during these cycles, how we should proceed going forward. I was very surprised by the high-level of turnout, as well as the interest they [U.S. shale executives] have shown in continuing this energy dialogue."[56] Barkindo explained that OPEC and Defendants "compared notes on our experiences in this cycle [*i.e.*, the recent price war] which everyone agreed was the most injurious."[57]

99.    As one shale executive, who insisted on remaining anonymous, described it to *Reuters*, shale oil producers had parlayed a successful price-war resistance into a seat at OPEC's "table on pricing."[58]

---

[54] *Id.*

[55] Ernest Sheyder, *Nigeria Prime Minister Says Majors in Shale, OPEC Should Keep Crude Price Stable*, REUTERS (Mar. 5, 2018), https://www.reuters.com/article/us-ceraweek-energy-nigeria/nigeria-minister-says-majors-in-shale-opec-should-keep-crude-price-stable-idINKBN1GH347.

[56] *Special Edition: OPEC International Energy Dialogues*, OPEC BULLETIN (Org. of the Petroleum Exporting Countries, Vienna, Austria) (May 9, 2018), at 51, https://www.opec.org/opec_web/static_files_project/media/downloads/publications/OB022019.pdf.

[57] Patti Domm, *OPEC Wants to Take Its Relationship with US Shale Producers to the Next Level*, CNBC (Mar. 6, 2018), https://www.cnbc.com/2018/03/06/opec-wants-to-take-its-relationship-with-us-shale-producers-to-the-next-level.html.

[58] Alex Lawler and Ernest Scheyder, *OPEC to Meet with U.S. Shale Firms in Houston on Monday: Sources*, REUTERS (Feb. 27, 2018), https://www.reuters.com/article/us-oil-opec-usa/opec-to-meet-with-u-s-shale-firms-in-houston-on-monday-sources-idUSKCN1GB2KP.

100.    In the wake of the 2018 conference, Defendant Continental's CEO Harold Hamm "appeared . . . to be trying to reach a more conciliatory tone with OPEC producers" and, in May 2018, even "attended a board meeting of Saudi Aramco, the oil producer controlled by OPEC's largest member, Saudi Arabia."[59]

101.    Following the CERAWeek 2018 dinner, Secretary General Barkindo invited U.S. shale officials to join him at an OPEC summit in Vienna in June 2018.[60] Defendants' executives Scott Sheffield (Pioneer) and John Hess (Hess) attended the June 2018 OPEC International Seminar in Vienna, Austria. At the event, Defendant Sheffield spoke for all Defendants when he said, "[t]hey [OPEC] need to put together some kind of deal to phase into the market. None of us want $80 to $100 [per barrel] oil, that's too high. There's a sweet spot between $60 and $80."[61] Defendant Sheffield urged, "OPEC needs to fulfil its duty."[62]

102.    Critically, the 2018 OPEC summit in Austria was the first time Defendants admitted publicly to more than listening to OPEC during these meetings. Defendant Sheffield admitted speaking to the OPEC panel about Defendants' and OPEC's volumes, and the effects on global oil prices: "My message yesterday as I spoke to the panel was that it's important that OPEC increases production somewhat to make up for the difference. If they don't we are going to see $100 oil or higher."[63]

---

[59] Ernest Scheyder, *Continental Resources CEO Harold Hamm Pulls Out of OPEC Meeting*, REUTERS via YAHOO NEWS (June 18, 2018), https://www.yahoo.com/news/continental-resources-ceo-harold-hamm-162200046.html.

[60] Domm, *supra* n.57.

[61] Ernest Scheyder, *U.S. Shale Executive Pushes OPEC to Gradually Boost Output*, REUTERS (June 20, 2018), https://www.reuters.com/article/oil-opec-pioneer-natl-rsc-idINKBN1JG2OB.

[62] *Id.*

[63] Video of *Pioneer Chairman Sees an OPEC Increase of Up to 600,000 B/D* at 0:10, BLOOMBERG, (June 21, 2018), https://www.bloomberg.com/news/videos/2018-06-21/pioneer-chairman-sees-an-opec-increase-of-up-to-600-000-b-d-video.

103.    Defendant Sheffield delivered a message, and apparently got one in return. Two days before OPEC's June 22, 2018, production negotiation, Sheffield predicted to Bloomberg the exact amount of OPEC's production change. Specifically, Defendant Sheffield said "[t]he soft number will be around 5-600,000 [bpd], they might announce 1 million  and that will phase in over the next few months" which came to pass two days later.[64] Reporting on OPEC's announcement *Reuters* stated: "Saudi Arabia said the move [increase in production] would translate into a nominal output rise of around 1 million barrels per day (bpd), or 1 percent of global supply.  Iraq said the real increase would be around 770,000 bpd[.]"[65]

104.    In January 2019, at the Davos World Economic Forum in Switzerland, OPEC's Secretary General sat on a panel with Defendant John Hess, CEO of Defendant Hess Corp, Vicki Hollub, CEO of Defendant Occidental, and Dan Yergin, Vice Chairman of IHS Markit.[66]

105.    According to *Reuters*, Hess and Hollub both "said that [the] growth of U.S. shale oil output would slow" in the near future.[67] OPEC's Secretary General addressed the current oil market dynamics at Davos, highlighting the importance of OPEC+ in helping stabilize the oil

---

[64] *Compare id.* at 1:08 (Sheffield: "The soft number will be around 5-600,000 [bpd], they might announce 1 million and that will phase in over the next few months.") *with* Rania El Gamal, et al., *OPEC Agrees Modest Hike in Oil Supply After Saudi and Iran Compromise*, REUTERS (June 22, 2018) ("Saudi Arabia said the move [increase in production] would translate into a nominal output rise of around 1 million barrels per day (bpd), or 1 percent of global supply. Iraq said the real increase would be around 770,000 bpd[.]"), https://www.reuters.com/article/us-oil-opec/opec-agrees-modest-hike-in-oil-supply-after-saudi-and-iran-compromise-idUSKBN1JI0OG.

[65] Rania El Gamal, et al., *OPEC Agrees Modest Hike in Oil Supply After Saudi and Iran Compromise*, REUTERS (June 22, 2018) ("Saudi Arabia said the move [increase in production] would translate into a nominal output rise of around 1 million barrels per day (bpd), or 1 percent of global supply. Iraq said the real increase would be around 770,000 bpd[.]"), https://www.*reuters*.com/article/us-oil-opec/opec-agrees-modest-hike-in-oil-supply-after-saudi-and-iran-compromise-idUSKBN1JI0OG/.

[66] IHS performs market analyses on behalf of OPEC member nations.

[67] Dmitry Zhdannikov, *U.S. Oil Firms Tell OPEC Their Growth Will Slow*, REUTERS (Jan. 23, 2019), https://www.reuters.com/article/uk-davos-meeting-opec-usa-idUKKCN1PH1TG.

market over the past two years following the price war.[68] He also underscored that market uncertainties and volatility are detrimental to industry investments, and that continuing joint and collaborative efforts among producers were crucial to ensure timely investments.[69]

106.    These comments were praised by Hess, who said that "the Secretary General of OPEC, as well as OPEC Members, play a very important role in stabilizing markets for oil, so those efforts are to be recognized."[70] Referencing OPEC's relationships with Defendants, Barkindo emphasized, "[w]e have to continue to collaborate. It is one industry. It is a global industry, and I think our colleagues in the U.S. are on the same page with us and we will work together to exchange views."[71]

107.    During the CERAWeek Conference running from March 11 through March14, 2019, U.S. shale executives met with OPEC members. Bloomberg reported that "[t]he event has become an informal communication channel between the cartel and fast-growing shale producers."[72] Discussing his upcoming meeting with U.S. shale executives, Secretary General Barkindo shared, "[w]e initiated a valuable dialogue with the U.S. shale producers two years ago in the midst of the last cycle and we agreed to continue the dialogue because we broke barriers . . . It is essential we continue the conversation with U.S. shale industry."[73]

---

[68] *Id.*

[69] *Id.*

[70] Tom DiChristopher, *Trump Blasted OPEC This Past Year. Hess CEO Says the Oil Producer Group Deserves Praise*, CNBC (Jan. 23, 2019), https://www.cnbc.com/2019/01/23/trump-blasted-opec-hess-ceo-says-the-group-deserves-praise.html.

[71] *Id.*

[72] Javier Blas and Kevin Crowley, *OPEC to Break Bread With Shale Competitors for Third Year*, BLOOMBERG (Mar. 11, 2019), https://web.archive.org/web/20240627161650/https://www.bnnbloomberg.ca/opec-to-break-bread-withshale-competitors-for-third-year-1.1227226.

[73] *Id.*

108.    Barkindo reported that a Monday night dinner attended by CEOs Defendant John Hess, Vicki Hollub, Mark Papa, and Travis Stice, from Defendants Hess, Occidental, Centennial, and Diamondback, respectively,[74] included a "friendly conversation on current industry issues and the immediate prospects and challenges for all."[75] Diamondback CEO Stice spoke with reporters directly after what he called "a very good session" between OPEC and Defendants, noting that the meeting featured "open dialogue on some of the things that are going on in the U.S. shale revolution, U.S. oil production and the associated balance of what's going on in our industry."[76] Figure 2 below is a photograph that shows Defendant John Hess (left) with OPEC Secretary General Mohammed Barkindo (center) in Houston on March 11, 2019.[77]

**Figure 2. OPEC Official and Defendants' Officers**



109.    In early 2019, OPEC and its allies began new production cuts, agreeing to reduce supply by 1.2 million bpd over the next six months.[78] After the cuts were announced, *Reuters*

---

[74] *CERAWeek 2019 in Review – New World of Rivalries: Reshaping the Energy Future*, CERAWEEK (Mar. 2019), https://cdn.ihsmarkit.com/www/pdf/0819/CW19Review.pdf.; Javier Blas & Rachel Adams-Heard, *OPEC Splits Avocado Appetizer with Shale Adversaries in Texas,* BLOOMBERG (Mar. 11, 2019), https://www.bloomberg.com/news/articles/2019-03-11/opec-to-break-bread-with-shale-rivals-in-houston-for-3rd-year#xj4y7vzkg.

[75] Blas and Adams-Heard, *supra* n.74.

[76] *Id.*

[77] *Id.*

[78] Alex Lawler, *OPEC Posts First 2019 Oil-Output Rise Despite Saudi Cuts*, REUTERS (Aug. 30, 2019), https://www.*reuters*.com/article/us-oil-opec-survey-idUSKCN1VK1YD.

reported that "U.S. shale producers cheered OPEC's decision to trim output, a move that sent crude prices higher [when announced] closing at levels that [shale] oil executives said would keep their profits flowing."[79] At CERAWeek 2019, Barkindo indicated that OPEC and allies will continue supply adjustments through 2019.[80]

## VII.    2021: Defendants Actualize Their Agreement Amongst Themselves and with OPEC

110.    Defendants did not let the COVID-19 crisis go to waste. Rather they took steps, during and in the aftermath of the crisis, to manage production and more closely coordinate their output to achieve price objectives in conjunction with OPEC. The groundwork for actualization of this coordinated and programmatic approach to production was put in place prior to 2020, so that through the end of 2018, it at least appeared to the outside world that OPEC's pleas were falling on deaf ears, as depicted in Figure 3 below.

### Figure 3. Change in Crude-Oil Production – U.S. Shale Oil v. OPEC (2014-2019)[81]

---

[79] Jennifer Hiller, *U.S. Shale Producers See OPEC Pullback Helping 2019 Profits*, REUTERS (Dec. 8, 2018), https://www.*reuters*.com/article/idUSL1N1YC20I/#:~:text=HOUSTON%2C%20Dec%207%20(*Reuters*), would%20keep%20their%20profits%20flowing.

[80] *OPEC Secretary General on Saudi Arabia's Oil Production, Venezuela and NOPEC*, CNBC (Mar. 12, 2019), https://www.cnbc.com/video/2019/03/12/opec-secretary-general-on-saudi-arabias-oil-production-venezuela.html.

[81] Graph comparing changes in crude-oil production by U.S. and OPEC since 2014, Sarah McFarlane and Pat Minczeski, *OPEC vs. Shale: the Battle for Oil Price Supremacy*, https://www.wsj.com/articles/opec-vs-shale-the-battle-for-oil-price-supremacy-11555588826 (last accessed July 22, 2024).



Source: U.S. Energy Information Administration

111.    Indeed, analysts predicted that 2019 would be the start of "[t]he second wave of the U.S. Shale revolution," which should have been "concerning for OPEC" because "U.S. oil output is expected to grow by 1.4 million barrels a day this year, to average 12.4 million barrels a day."[82]

112.    The second wave never occurred. In 2020, lockdowns associated with the COVID-19 pandemic cratered gasoline demand, sending multiple shocks through the world oil markets. Worldwide oil production fell,[83] and the U.S. shale oil industry consolidated and suffered as production fell and smaller Independents went bankrupt.[84]

---

[82] *Id.*

[83] Charles Riley, *Oil Prices Surge as OPEC and Its Allies Extend Production Cuts*, CNN BUSINESS (Mar. 4, 2021) (due to the global Coronavirus pandemic and market panic, OPEC members agreed to "slash[] output [of crude oil] by a record-shattering 9.7 million barrels per day"), https://www.cnn.com/2021/03/04/investing/opec-oil-prices-saudi-russia/index.html.

[84] Irina Slav, *Shale Executives See Little Chance of Significant Growth*, BUSINESS INSIDER (Dec. 6, 2020) ("Between January and October, 43 oil and gas producers in North America filed for bankruptcy protection. Most of them were from the shale patch."), https://markets.businessinsider.com/news/stocks/shale-executives-see-little-chance-of-significant-growth-1029867633.

113.    During this economic turmoil, Defendants and OPEC signaled to each other their willingness to end their price war and competition once-and-for-all and collaborate on their respective production levels and, consequently, crude oil prices. In July 2020, OPEC's Secretary General made it clear that OPEC could inflate and sustain high crude prices if Defendants cooperated:

> We were able to reach out to the US [I]ndependents and we had established a line of communication with them. We have reached some level of comfort among ourselves. They have been participating also at their own levels to ensure that this conversation is inclusive and is led by the biggest producers. There is no objective whatsoever from us as a group or as individual countries to drive U.S. shale production out of business. . . . Everybody has a role to play. . . . We are very much appreciative of the support and the cooperation we are getting from the U.S. both at the level of policymakers as well as from industry.[85]

114.    On November 28, 2020, Defendant EOG's CEO Bill Thomas signaled Defendants' willingness, as a group, to follow OPEC's lead on pricing: "In the future, certainly we believe OPEC will be the swing producer—really, totally in control of oil prices. . . . We don't want to put OPEC in a situation where they feel threatened, like we're taking market share while they're propping up oil prices."[86]

115.    When the world began to emerge from the pandemic in early 2021, gasoline demand surged, and with it, so did crude oil prices, reaching nearly $70 a barrel in March 2021. As OPEC and OPEC+ countries emerged from the pandemic, they collectively withheld production to push up prices further.[87] Defendants also responded to rising prices by withholding

---

[85] *OPEC Secretary General: No Objective to Drive US Shale Out of Business*, OIL & GAS JOURNAL (July 9, 2020), https://www.ogj.com/general-interest/article/14179258/opec-secretary-general-no-objective-to-drive-us-shale-out-of-business.

[86] Kevin Crowley, et al., *The Pandemic Has Broken Shale and Left Oil Markets in OPEC Hands*, BLOOMBERG (Nov. 28, 2020), https://www.bloomberg.com/news/articles/2020-11-28/the-pandemic-has-broken-shale-and-left-oil-markets-in-opec-hands.

[87] Charles Riley, *Oil Prices Surge as OPEC and Its Allies Extend Production Cuts*, CNN BUSINESS (Mar. 4, 2021), https://www.cnn.com/2021/03/04/investing/opec-oil-prices-saudi-russia/index.html.

production, suddenly (and in near-unison) preaching supply "discipline" for the first time in the history of U.S. shale. Over the course of 2021, Defendants would continue to signal to each other, OPEC, and the market that they were no longer competing for market share or willing to act as swing producers.

116.    The combined impact of OPEC and "Tight Oil" coordinated supply decisions suppressed production and increased prices with coordination creating a "positive feedback" loop for the industry at the cost of supracompetitive and distorted WTI prices over time.

**Figure 4. Combined Impact of Coordinated OPEC and "Tight Oil" Industry Decisions Increase and Distort WTI Market[88]**



Source: U.S. Energy Information Administration

117.    Over the course of 2021, Defendants would continue to signal to each other and OPEC that they were no longer competing for market share or willing to act as swing producers:

a.    In a February 2021 interview, Defendant Chesapeake CEO Doug Lawler explained that U.S. shale producers were entering a "new era" of shale production that "requires a different mindset" of "more discipline and responsibility."[89]

b.    Defendant Pioneer CEO Defendant Scott Sheffield agreed, predicting that small companies would increase output but in the aggregate U.S output would remain

---

[88] Graph of WTI spot oil price and combined volume of OPEC-imported oil and U.S. tight oil production, created using data from U.S. Energy Information Administration.

[89] Alex Lawler & Jennifer Hiller, *OPEC, U.S. Oil Firms Expect Subdued Shale Rebound Even as Crude Prices Rise*, REUTERS (Feb. 23, 2021), https://www.reuters.com/article/us-shaleopec-outlook/opec-u-s-oil-firms-expect-subdued-shale-rebound-even-as-crude-prices-riseidUSKBN2AM0E2/.

flat, even if crude prices go above $60, as the large U.S. Independents would jointly practice discipline.[90]

c.    In March 2021, on the same day OPEC announced supply restrictions, Defendant Occidental CEO Vicki Hollub said that despite a "healthier supply and demand environment" and "a V-shaped" post-pandemic recovery, U.S. oil production would not return to pre-pandemic heights, because Defendants and other U.S. shale producers were "committed to value growth, rather than production growth."[91]

d.    In April 2021, Defendant Pioneer CEO Defendant Sheffield said that U.S. shale producers risked another price war with OPEC and its allies if they resumed the breakneck production growth of the last decade. He also balked at the federal government's forecasts that predicted an increase in domestic oil production, and instead declared he was "totally against" any production increase as "producers now know the stakes and will stick to their mantra of capital discipline."[92]

e.    In a June 2021 interview with *Reuters*, Defendant Sheffield said he was "confident the producers will not respond" to the high crude oil prices by increasing production, because they were focused on "shareholder returns."[93] According to *Reuters*, "[i]n the United States, closely held companies have contributed

---

[90] *Id.*

[91] Pippa Stevens, *U.S. Oil Production Won't Return to Pre-Pandemic Levels, Says Occidental CEO*, CNBC (Mar. 4, 2021), https://www.cnbc.com/2021/03/04/us-oil-production-wont-return-to-pre-pandemic-levels-occidental-ceo.html#:~:text=Occidental%20CEO%20Vicki%20Hollub%20said,Evolve%20conversation%20with%20Brian%20Sullivan.

[92] Kevin Crowley, *Pioneer Chief Warns of OPEC+ Price War Risk*, RIGZONE (Apr. 14, 2021), https://www.rigzone.com/news/wire/pioneer_chief_warns_of_opec_price_war_risk-14-apr-2021-165162-article/.

[93] Liz Hampton, *U.S. Shale Industry Tempers Output Even as Oil Prices Jump*, REUTERS (June 28, 2021), https://www.reuters.com/business/energy/us-shale-industry-tempers-output-even-oil-price-jumps-2021-06-28.

substantially to rig additions this year, but Sheffield said those smaller firms should not drive up volumes enough to ruffle OPEC+ producers."[94]

f.    On an August 5, 2021 earnings call, Defendant EOG President and CEO Bill Thomas, echoing Lawler's February 2021 language, referenced a "new era" of collaboration in the global crude oil market with a "more positive macro environment than we've been in since really the shale business started. I think OPEC+ is solid. I think the U.S. will remain disciplined. And so, I think the industry is in for a long run of really good results."[95]

g.    On October 3, 2021, Defendant Pioneer CEO Defendant Sheffield said U.S. producers were not willing to increase supply to curb soaring crude oil prices that were "under OPEC control,"[96] reflecting Defendants' production restraint agreement. Defendant Sheffield reaffirmed Defendant Pioneer's commitment to the agreement, promising to cap any Pioneer output increase at 5% per year no matter the price of crude oil, explaining "everybody's going to be disciplined, regardless whether it's $75 Brent, $80 Brent, or $100 Brent."[97]

118.    Given that Defendants' breakeven prices at the time were around $40/barrel,[98] Defendants' newly-discovered restraint came as a surprise to some oil industry observers:

---

[94] *Id.*

[95] EOG Resources (EOG), *Q2 2021 Earnings Call Tr.,* THE MOTLEY FOOL (Aug. 5, 2021), https://www.fool.com/earnings/call-transcripts/2021/08/05/eog-resources-eog-q2-2021-earnings-call-transcript/.

[96] Derek Brower and David Sheppard, *US Shale Drillers Cannot Contain Oil Price Rise, Pioneer Boss Says*, FIN. TIMES (Oct. 3, 2021), https://www.ft.com/content/c21eb656-8d09-45ce-a13a-7d8419426b05.

[97] *Id.*

[98] EOG Resources, *Value Matters: 4Q 2021 Presentation* (2022) (Defendant EOG's price needed to secure 10% return on capital, not breakeven, was ~$40), https://s24.q4cdn.com/589393778/files/doc_financials/2021/q4/EOG_0222.pdf; Occidental Petroleum

a.  In January 2021, *Reuters* reported that "U.S. shale producers are keeping their pledges to hold the line on spending and keep output flat, a departure from previous boom cycles."[99]

b.  In June 2021, another *Reuters* columnist noted that "U.S. shale producers have normally captured market share from OPEC+ whenever prices have been above $55-60 per barrel."[100] 2021's "run up in crude prices, and oil output curbs imposed by the OPEC+ producers group, historically would have triggered a drilling boom."[101] However, the author observed that Defendants' output restraints had "emboldened OPEC+ to maintain its own output curbs, temporarily removing the threat of lost market share and accelerating the upward pressure on prices. . . . Shale producers have publicly reiterated their new commitment to output restraint in interviews as well as calls with analysts and investors."[102] The author noted that "there is a broad consensus among OPEC+ countries and the U.S. shale industry on the need for slower output growth, higher prices, and wider profit margins."[103]

c.  On Defendant Chesapeake's Q4 2021 earnings call, Bank of America Managing Director and Head of U.S. Oil and Gas was confounded by Chesapeake's new

---

Corp; *Q3 2020 Earnings Call Tr.*, OXY (Nov. 10, 2020), (Defendant Occidental's breakeven price ~$40), https://www.oxy.com/globalassets/documents/investors/quarterly-earnings/OXY3Q20Transcript.pdf; Slide 11, *Investor Presentation,* Diamondback Energy (Nov. 2021) (Defendant Diamondback Energy's 2021 breakeven price was "approximately $32 per barrel.") https://www.diamondbackenergy.com/static-files/532c60b3-f8f0-4f43-8368-91b9f4b628e2).

[99] Hampton, *supra* n.93.

[100] John Kemp, *U.S. Shale Restraint Pushes Oil Prices to Multi-Year High*, Reuters (June 4, 2021), https://www.reuters.com/article/global-oil-kemp-idAFL5N2NM37M.

[101] Hampton, *supra* n.93.

[102] Kemp, *supra* n.100.

[103] *Id.*

strategy, telling Chesapeake CEO that their plans to slow production would be "the easiest way to destroy value" for the company in the long term.[104]

119.    OPEC, however, was not surprised. In early 2021, OPEC estimated that U.S. shale production would see a significant annual drop. *Reuters* reported that anonymous OPEC sources confirmed "[t]he lack of a shale rebound could make it easier for OPEC and its allies to manage the market."[105] OPEC also signaled that the price war was over. Secretary General Barkindo told *Reuters* that "U.S. shale is an important stakeholder in our global efforts to restore balance to the oil market" and that Independents and OPEC "have a shared responsibility in this regard."[106]

## VIII.    During 2022-2023, Prices Reach $200 Per Barrel

120.    In 2022, after Russia invaded Ukraine, crude oil prices spiked. Unlike the steep fall in demand during the early days of COVID-19, this was a supply-side shock that resulted in a decrease in the volume of oil available in the U.S. market, both from increased strain on supply chains, and more importantly, the separation of Russia's oil production from the world market.

121.    By mid-2022, oil crossed $120 a barrel. At this price, oil cost more than at any point during the five-year runup to the OPEC Price War, and nearly quadruple the 2016 price war low water mark.

122.    OPEC responded to the possibility that the high prices might recede with further production restraint, including cuts in October 2022 of "two million barrels per day." These

---

[104] *Chesapeake Energy Corporation (CHK) CEO Nick Dell'Osso on Q4 2021 Results - Earnings Call Transcript*, SEEKINGALPHA (Feb. 24, 2022), https://seekingalpha.com/article/4489980-chesapeake-energy-corporation-chk-ceo-nick- dellosso-on-q4-2021-results-earnings-call.

[105] Lawler and Hiller, *supra* n.89.

[106] *Id.*

amounts were announced as crude prices began to normalize from their near-record highs, and were intended to "stabilize the recent fall in global energy prices."[107]

123.    Despite record prices in 2022 and consistently high prices in 2023, in a break from their prior behavior,[108] Defendants refused to increase production in an independently economically rational manner:

    a.    In February of 2022, as Russian troops staged on the Ukrainian border in advance of the invasion, Defendant Sheffield again made comments that support the existence of an agreement between and among Defendants: "In regard to the industry, it's been interesting watching some of the announcements so far, the public[ly listed] [I]ndependents are staying in line" and "I'm confident they will continue to stay in line."[109] Indeed, following the massive 2022 oil price spike during which oil prices increased 20% between just January and February 2022, Defendant Sheffield emphasized, "[w]hether it's $150 oil, $200 oil, or $100 oil, we're not going to change our growth plans[.]"[110]

---

[107] Jeff Stein, et al., *OPEC, Allies Move to Slash Oil Production, Eliciting Blistering White House Response*, THE WASH. POST (Oct. 5, 2022), https://www.washingtonpost.com/business/2022/10/05/opec-plus-oil-cut-russia-saudi-arabia.

[108] *See* Lawler & Scheyder, *supra* n.52; *see also* Erik Norland, *As Oil Prices Plunge, What Will Swing Producers Do?*, CME GROUP (Nov. 21, 2018) (in the past, "higher [crude oil] prices incentivized an enormous increase in U.S. production", and even OPEC members understood that "[i]t's normal for shale oil, tight oil [production] to increase . . . whenever oil prices support it."), https://www.cmegroup.com/education/featured-reports/as-oil-prices-plunge-what-will-swing-producers-do.html.

[109] Tsvetana Paraskova, *Not Even $200 Oil Will Make Shale Giants Drill Aggressively*, OILPRICE (Feb. 18, 2022), https://oilprice.com/Energy/Energy-General/Not-Even-200-Oil-Will-Make-Shale-Giants-Drill-Aggressively.html.

[110] *Id.*

b.      Later in February, other Defendants signaled their alignment. During an earnings
call, Defendant Continental's CEO Berry confirmed, "[w]e project generating flat
to 5% annual production growth over the next five years. . . ."[111]

c.      Defendant Diamondback's executive Stice explained on February 22, 2023, "we
have no reason to put growth before returns . . . we will continue to be
disciplined."[112]

d.      Bloomberg reported on February 24, 2022 that Defendant "EOG Resources Inc.
plan[ned] to restrain oil growth [in 2022] despite surging prices, falling into line
with most other major U.S. independent shale producers. Like [Defendant] Pioneer
Natural Resources and [Defendant] Continental Resources[, who] are also limiting
increases to less than 5% this year."[113]

e.      In March 2022, Occidental Petroleum's CEO Vicki Hollub stated that Occidental
had a "huge inventory of high-quality investments" available around the world,
especially in U.S. shale, but was not acting on those opportunities to expand
production, instead focused on maintaining high profits.[114]

f.      On an August 2022 earnings call, Defendant EOG said it planned to keep
production growth to "low single digits" in 2023 and it was "committed to

---

[111] *Id.*

[112] Geert De Lombaerde, *Diamondback to Keep Production Flat, Invest $1.75 Billion in 2022*, OIL & GAS J. (Feb. 23, 2022), https://www.ogj.com/drilling-production/article/14234465/diamondback-to-keep-production-flat-invest-175b-in-22.

[113] Kevin Crowley, *EOG Holds Back Oil-Production Growth in Line with Shale Peers*, BLOOMBERG (Feb. 24, 2022), https://www.bloomberg.com/news/articles/2022-02-24/eog-holds-back-oil-production-growth-in-line-with-shale-peers.

[114] Pippa Stevens, *Oil Producers in a 'Dire Situation' and Unable to Ramp Up Output, Says Oxy CEO*, CNBC (Mar. 8, 2022), https://www.cnbc.com/2022/03/08/oil-producers-in-a-dire-situation-and-unable-to-ramp-output-says-oxy-ceo.html.

remaining disciplined" despite ideal economic conditions for production increases.[115] In 2022, EOG increased production by only 4% and said it was targeting the same increase in 2023.[116]

g.    In January 2023, Sheffield confirmed that the "aggressive growth era of US shale is over" and that Pioneer and the other Defendants were "no longer a swing producer."[117]

h.    When asked in a March 2023 interview why Occidental was not using its profits to "drill more wells" and "bring down prices," Defendant Occidental's President, Vicki Hollub responded that "prices are in a good place right now," "gas prices at the pump are not so bad at this price," and Occidental had no intention of increasing production to meet global demand and lower U.S. consumer gas prices, despite having the ability to profitably increase production.[118]

124.    Knowing Independents' breakeven prices were continuing to fall, oil industry observers expressed disbelief at Defendants' refusal to compete for market share:

---

[115] EOG Resources, *Q2 2022 Earnings Call Tr.,* THE MOTLEY FOOL (Aug. 5, 2022), https://www.fool.com/earnings/call-transcripts/2022/08/05/eog-resources-eog-q2-2022-earnings-call-transcript.

[116] Liz Hampton, *U.S. Shale Producer EOG Sticks to 4% Annual Output Growth*, REUTERS (Aug. 5, 2022), https://www.reuters.com/business/energy/us-shale-producer-eog-maintain-low-single-digit-oil-output-2022-08-05.

[117] Derek Brower and Myles McCormick, *What the End of the US Shale Revolution Would Mean for the World*, FIN. TIMES (Jan. 15, 2023), https://www.ft.com/content/60747b3b-e6ea-47c0-938d-af515816d0f1.

[118] Ian Thomas, *U.S. Won't Reach a New Record in Oil Production 'Ever Again,' Says Pioneer Natural Resources CEO*, CNBC (Mar. 9, 2023), https://www.cnbc.com/2023/03/09/us-wont-reach-new-record-oil-production-ever-again-pioneer-ceo.html.

a.  In the words of the Washington Post, the price increases following the Russian invasion were a "clear signal to raise [shale] production; we're talking Bat-Signal clarity here."[119]

b.  A February 2022 Bloomberg article wondered why Defendant EOG wouldn't "take advantage of higher prices by pumping more crude from its shale fields." The article said that EOG "plan[ned] to restrain oil growth this year despite surging prices, falling into line with most other major U.S. independent shale producers."[120]

c.  In March 2022, a CNBC anchor observed: "I know we keep hearing about this key code word from all of the oil companies right now that they are 'disciplined,' but when you see oil at north of 120 dollars a barrel, I mean it's one thing to be disciplined, it's another thing to miss an opportunity."[121]

d.  In March 2023, the *Financial Times* published an article titled, "Oil executives warn of higher prices now that OPEC is back 'in charge.'"[122]

e.  A March 2023 *CNBC* article was titled "US won't reach a new oil record in oil production 'ever again' says Pioneer Natural Resources CEO."[123]

f.  On April 3, 2023, after OPEC made further cuts, Bloomberg reported that the U.S. shale industry did not plan to "break a three-year trend" by increasing production in response to rising oil prices, and would not "rescue" U.S. consumers from high

---

[119] Denning, *supra* n.20.

[120] Crowley, *supra* n.113.

[121] Stevens, *supra* n.114.

[122] Myles McCormick, Derek Brower, & Justin Jacobs, *Oil Executives Warn of Higher Prices Now That OPEC Is Back in Charge*, Fin. Times (Mar. 8, 2023), https://www.ft.com/content/f1674a6e-39ae-4abb-ae2a-40fefb58d6b9.

[123] Thomas, *supra* n. 118.

gas prices, despite being "flush with cash after record profits."[124] According to one industry expert, "OPEC and shale are much more on the same team now, with supply discipline on both sides" which "really puts a floor under the price of oil long term."[125]

125.    Defendants continued meeting with OPEC officials in 2022 and 2023.

a.    **2022**: Once again, Defendants met with OPEC officials during the 2022 CERAWeek Conference in Houston, Texas between March 6-10, 2022. *Reuters* reported that at the time of this conference, "[i]t was at least the fourth time since 2017 that U.S. shale oil producers and OPEC officials have held such meetings to discuss energy concerns."[126] In Houston, Defendants and OPEC "gathered in a private room at a restaurant and U.S. producers presented OPEC Secretary General Barkindo with a bottle labeled 'Genuine Barnett Shale' – from the oilfield that launched the shale revolution. Barkindo proudly displayed the memento as he left the meeting, which included executives from Hess Corp . . . and Chesapeake Energy."[127] As *Reuters* noted, Defendants and OPEC "found themselves on similar sides as oil prices have surged well above $100 a barrel: in no rush to rapidly boost production."[128] Chesapeake CEO Domenic Dell'Osso confirmed that "[w]ere

---

[124] Kevin Crowley and Mitchell Ferman, *Don't Expect US Shale to Quickly Fill the Gap Left by OPEC+ Cut*, BLOOMBERG (Apr. 3, 2023), https://www.bloomberg.com/news/articles/2023-04-03/opec-surprise-cut-won-t-be-filled-by-us-shale-oil?in_source=embedded-checkout-banner.

[125] *Id.*

[126] Liz Hampton and Arathy Somasekhar, *OPEC Meets with U.S. Shale Executives as Oil Prices Skyrocket*, REUTERS (Mar. 7, 2022) (In attendance: EQT Corp. Chief Executive Officer Toby Rice, Hess Corp. CEO John Hess and Chesapeake Energy CEO Domenic Dell'Osso), https://www.reuters.com/business/opec-meet-with-us-shale-executives-us-energy-conference-oil-prices-skyrocket-2022-03-08/.

[127] Hampton, *supra* n.36.

[128] *Id.*

shale to ramp up output only to have prices fall, we have destroyed a lot of value for shareholders and haven't helped the problem."[129]

b.    **2023:**  In March, 2023, the *Financial Times* reported that "about two dozen [U.S. shale executives] including [Defendants' executives:] [Scott] Sheffield [of Pioneer], . . .Nick Dell'Osso of Chesapeake Energy, Travis Stice of Diamondback Energy, Vicki Hollub of Occidental Petroleum, and John Hess of Hess Corporation met with OPEC Secretary General[-elect] Haitham Al Ghais[130] for a private dinner in a downtown Houston steakhouse" to reaffirm their agreement to restrict production, "[d]espite recent record profits."[131] During this dinner, it was reported that "[t]he shale executives pressed Al Ghais on how much spare production capacity OPEC could deploy, and offered their own assessment of how much extra output the US could deliver this year – a range between 400,000 and 600,000 b/d, according to one person at the dinner."[132] In the article, Defendant Sheffield doubled down on his support of OPEC, "I think the people that are in charge now

---

[129] *Id.*

[130] In January 2022, OPEC declined to grant Mohammad Sanusi Barkindo a third term as Secretary General and chose Haitham Al-Ghais, a veteran oil official from Kuwait, as his successor. Barkindo was scheduled to leave his position at the end of July 2022, but passed away on July 5, 2022. According to the *New York Times*, "[t]here is no indication that the change of leadership will influence how much oil OPEC produces." Stanley Reed, *Mohammad Barkindo, OPEC's Top Oficial, Dies*, THE N.Y. TIMES (July 6, 2022), https://www.nytimes.com/2022/07/06/business/opecbarkindo.html#:~:text=Barkindo%20was%20schedul ed%20to%20leave,how%20much%20oil%20OPEC%20produces.

[131] Myles McCormick, et al., *Oil Executives Warn of Higher Prices Now that OPEC Is Back in Charge*, FIN. TIMES (Mar. 8, 2023), https://www.ft.com/content/f1674a6e-39ae-4abb-ae2a-40fefb58d6b9.

[132] *Id.*

are three countries – and they'll be in charge the next 25 years. Saudi first, UAE second, Kuwait third."[133]

126.    Defendants' own employees were unable to explain why production was not ramping up to meet market demand:

a.    A former Senior Lease Operator at Defendant Diamondback found it "somewhat weird" that "even with multiple acquisitions and growth, [Diamondback] always maintain[ed] flat production and flat oil sales" during the Class Period.  He was confused by this strategy, asking, "We're an oil company, we make money by selling oil . . . at times when oil was $95 a barrel, why aren't we ripping these things open?"

b.    A former Operations Accountant at Defendant Pioneer shared that he observed significant delays, often up to a year, in bringing wells on to produce shale oil throughout the Class Period.  This former employee asked his direct supervisor numerous times why these delays were happening and was told that the operations team made those decisions and, at other times, his supervisor did not have an explanation.  Additionally, this former employee attended Pioneer's quarterly company-wide town hall meetings and said that during these meetings, Sheffield would make statements "that did not match the information [he] was seeing" in the drilling data.

127.    In early 2023, Defendants removed all doubt that they were coordinating with OPEC.

---

[133] *Id.*

128. On January 5, 2023, Defendant Pioneer's CEO Defendant Sheffield stated that "OPEC ministers are frustrated over the recent price fall," before predicting that forthcoming production was "going to change. If [the price] stays too low, it wouldn't surprise me if [OPEC] ha[s] another cut . . . . [W]e'll see what happens in the next 90 days."[134]

129. Eighty-seven (87) days later, OPEC "shocked traders around the world"[135] when it announced a "surprise" production cut, when OPEC "had been largely expected to stick to its already agreed 2m bpd cuts."[136]

130. In between Sheffield's prediction and the reveal, on March 27, 2023, news emerged that some Defendants, including at least Pioneer (Sheffield's company) and EOG, had pulled back the hedge positions they had previously established to protect against downward oil price movements. This left Defendants "suddenly vulnerable" and exposed them to massive economic risk if oil prices went down.[137]

131. Indeed, Defendant Pioneer's CEO, Defendant Sheffield, defended the extraordinarily risky move, stating "we're not going to hedge," and that he was still "optimistic that we'll see $100 a barrel before the end of the year."[138]

132. Less than a week after news emerged of Defendants' exposed positions, on April 2, 2023, OPEC announced their "surprise" production cut, slashing 1.15 million barrels of oil

---

[134] Kevin Crowley, *One Shale Executive Correctly Called OPEC+'s Surprise Output Cut*, BLOOMBERG (Apr. 4, 2023), https://www.bloomberg.com/news/articles/2023-04-04/one-shale-executive-correctly-called-opec-s-surprise-output-cut?sref=NqTCpwwa#xj4y7vzkg.

[135] *Id.*

[136] Reuters, *OPEC+ Announces Surprise Cuts in Oil Production*, THE GUARDIAN (Apr. 2, 2023), https://www.theguardian.com/business/2023/apr/02/opec-announces-surprise-cuts-in-oil-production-of-about-115-mbpd.

[137] Justin Jacobs, *Shale Oil Drillers Left Exposed After Pulling Back Price Hedges*, FIN. TIMES (Mar. 28, 2023), https://www.ft.com/content/c3baf69f-41fc-42ea-b13a-5ef6f546e143.

[138] *Id.*

production per day.[139] Defendants' failure to hedge was inexplicable but for their advanced knowledge of OPEC's planned production cuts.

133.    In April 2023, an energy analyst succinctly summarized the effects of Defendants' output constraint agreement:

> In its early days, shale behaved like a dimmer, with output growth accelerating proportionally as oil prices were dialed up.  That ability to respond quickly to the market was due to the speed at which shale wells could be developed: a few months compared to the years or decades of Big Oil projects.  Today, shale is as responsive as in the past.  But there's a difference.  ***The dimmer appears to be capped at a certain level: No matter how high oil prices go above that level – say $100 a barrel – the industry will no longer add rigs to sop up market share***.  Rather, it will stay put and go into harvest mode with existing wells – that's exactly what happened in 2022, much to the consternation of the White House, which urged shale companies to drill more.[140]

134.    Independents had the ability to increase production and gain market share, they collectively chose to pursue restrained production instead, as reflected in Table 1.

---

[139] *REUTERS, supra* n.136.

[140] Blas, *supra* n.27.

**Table 1: Defendants' U.S. Oil Production Growth Rates Slow as
Multi-Party Agreement Takes Root**

| Defendant | 2017-2019 U.S. Oil Production Growth Rate (Comparison Period) | 2021-2023 U.S. Oil Production Growth Rate (Class Period) |
|---|---|---|
| Centennial/Permian | 123% | 56% |
| Chesapeake | 31% | -63% |
| Continental | 43% | 42% |
| Diamondback | 220% | 19% |
| EOG | 36% | 6% |
| Hess | 25% | -6% |
| Occidental | 89% | 8% |
| Pioneer | 34% | 3% |
| Defendants' Production Weighted Average | 63% | 14% |
| Average Crude Oil Price per Barrel | $55.01 | $78.42 |
| Average U.S. Consumer Gasoline Price | $2.67 | $3.61 |

135.    Defendants' production restraint agreement significantly impacted volumes as the multi-party agreement had a particularly strong impact beginning no later than January 2021, as reflected in Figure 5.

**Figure 5. Reduced U.S. Tight Oil Production and Slower Production Growth Rates Drove WTI Price Increases Post COVID-19[141]**



Source: U.S. Energy Information Administration

136.     The joint impact of OPEC and "Tight Oil" illegally coordinated supply decisions was designed to and did significantly increase WTI pricing over the Class Period. As Defendant Centennial Resources stated in their annual report for 2020, "in late 2020 and early 2021, commitments made by OPEC and other oil producing countries to reduce their crude oil production, taken together with U.S. producers substantially reducing drilling and producing activities, resulted in higher commodity prices, but commodity prices remain volatile."[142]

137.     During the period, and particularly during the post-COVID recovery period, the change in indexed WTI crude oil prices significantly outstripped other consumer price indexed items.

---

[141] Graph of WTI spot price and U.S. tight oil production using data from the U.S. Energy Information Administration.

[142] Centennial Resource Development, Inc., February 24, 2021, *Form 10K*, SEC.gov.

**Figure 6. Reduced U.S. Tight Oil Production and Slower Production Growth Rates Drove WTI Price Increases Post COVID-19**



138.    Defendants are reaping the rewards in the form of massive revenue increases, while not reinvesting that additional revenue and increased cash flow into new production. *Compare* Figures 5 and 6 *with* Figures 7-14 (recording Defendants' revenue growth after 2020).

**Figure 7. U.S. Shale Producer's Reinvestment Rate (Capital Expenditure as a Percentage of Operational Cash Flow)[143]**



**Figure 8. Pioneer's Annual Revenue (USD)[144]**



139.    Defendants' production restraint agreement worked. Defendants are reaping the rewards in the form of massive revenue increases, while not reinvesting that additional revenue

---

[143] Graph of US oil producers' reinvestment rate into new drilling, Crowley and Ferman, *supra* n. 124 (last updated April 3, 2023).

[144] Figure 8 illustrates the reported revenue of Defendant Pioneer based on analysis of Forms 10-K filed with the SEC.

into new production. *Compare* Figures 5 and 6 *with* Figures 7-14 (recording Defendants' revenue growth after 2020).

**Figure 9. Permian/Centennial's Annual Revenue (USD)[145]**



**Figure 10. Chesapeake's Annual Revenue (USD)[146]**



---

[145] Figure 9 illustrates the reported revenue of Defendant Permian/Centennial based on analysis of Forms 10-K filed with the SEC.

[146] Figure 10 illustrates the reported revenue of Defendant Chesapeake based on analysis of Forms 10-K filed with the SEC.

**Figure 11. Continental's Annual Revenue (USD)[147]**



**Figure 12. Diamondback's Annual Revenue (USD)[148]**



---

[147] Figure 11 illustrates the reported revenue of Defendant Continental based on analysis of Forms 10-K filed with the SEC.

[148] Figure 12 illustrates the reported revenue of Defendant Diamondback based on analysis of Forms 10-K filed with the SEC.

**Figure 13. EOG's Annual Revenue (USD)[149]**



**Figure 14. Occidental's Annual Revenue (USD)[150]**



---

[149] Figure 13 illustrates the reported revenue of Defendant EOG based on analysis of Forms 10-K filed with the SEC.

[150] Figure 14 illustrates the reported revenue of Defendant Occidental based on analysis of Forms 10-K filed with the SEC.

## IX.    Defendants' "Restraint" Is Economically Irrational, Absent Agreement

140.    The terms Defendants used may have varied: being "disciplined," or focusing on "value growth," or "staying in line," or operating for "shareholder returns." But they are all code words for each of Defendants' agreement to coordinate and restrain domestic shale oil production. Further, Defendants' repeated public confirmation of their production discipline was an admission that they each had spare productive capacity that they chose not to utilize.

141.    In a competitive market for arguably the most important commodity on earth—crude oil—expanding production to take advantage of prices above your breakeven is the economically rational response.  If you do not, your competitor will, taking margin share and reinvesting their additional profits into further productive capacity and/or efficiency gains. Defendants taught OPEC this lesson during the Shale Revolution.

142.     In a competitive market, no single Defendant would restrain production unless they ***knew*** their competitors would also restrain their production.  No business in a competitive market would turn down opportunities to make three times marginal cost (*i.e.*, breakeven), and couch that economically irrational decision with a preposterous statement about focusing on "shareholder returns."  In a competitive market, if you are not drilling that oil, someone else is.

143.    Others did drill some of that oil.  Notoriously conservative and well-known to view fracking as a waste of time (in part because their overhead structure made small-scale operations relatively more expensive), the supermajors started investing in shale in 2021 and 2022 at rates previously unseen, in direct response to U.S. shale producers "underinvesting as an industry":[151]

---

[151] Clifford Krauss, *What Exxon & Chevron are Doing with Those Big Profits*, THE N.Y. TIMES (Feb. 1, 2023),       https://www.nytimes.com/2023/02/01/business/energy-environment/exxon-chevron-oil-gas-profit.html.

a.    ExxonMobil planned to boost its 2022 production level in the Permian Basin by 25% in response to record high crude oil prices.[152]

b.    Similarly, Chevron planned on a 10% increase in the same region in 2022 "from an even larger production base."[153]

c.    Midway through 2022, Chevron anticipated a "15% year-over-year increase" in shale oil production from 2021 and promised to continue "bolstering production."[154]

d.    In May 2023, ExxonMobil Chief Executive Darren Woods said that Exxon is hoping to double the amount of oil produced from its U.S. shale holdings over a five-year period using new technologies.[155]

e.    Smaller, non-public shale companies drilled some of that oil, too. In 2022, "[s]maller, privately held firms . . . raised production in response to higher prices and are going full steam ahead."[156] Due to the gap in production left by Defendants, these smaller private producers "[led] output gains during the highest

---

[152] Kevin Crowley, et al., *Exxon and Chevron Plan Permian Oil Surge as Peers Preach Caution*, BLOOMBERG (Feb. 2, 2022), https://www.bloomberg.com/news/articles/2022-02-01/exxon-joins-chevron-in-permian-oil-surge-as-peers-preach-caution.

[153] *Id.*

[154] *Chevron to Boost Permian Oil Production as Demand for Reliable Energy Grows*, CHEVRON (June 16, 2022), https://www.chevron.com/newsroom/2022/q2/chevron-to-boost-permian-oil-production-as-demand-for-reliable-energy-grows.

[155] Sabrina Valle, *Exxon CEO Says Technology Advances Could Double Its Shale Output*, REUTERS (June 1, 2023), https://www.*reuters*.com/business/energy/exxon-ceo-says-5-year-program-could-double-its-shale-output-2023-06-01.

[156] Liz Hampton, *U.S. Shale Oil Forecasts Keep Rising as Smaller Producers Lead the Way*, REUTERS (Mar. 2, 2022), https://www.reuters.com/business/energy/us-shale-oil-forecasts-keep-rising-smaller-producers-lead-way-2022-03-02.

[crude oil] prices in seven years."[157]  For example, *Reuters* reported that, "Tall City Exploration, a privately-backed Permian [basin] producer, added a second drilling rig . . . and is eying a three-fold increase" from 2021 in 2022 production.[158]

144.    Small shale oil producers going from one rig to two is not enough to meaningfully move U.S. production when Defendants control 18% of the total active oil rigs in the U.S., including conventional oil rigs and rigs owned by supermajors.[159]  With those rigs, in 2023 Defendants were responsible for approximately 16.2% of U.S. total crude oil production (including conventional crude oil).  Defendants are able to leverage their collective market share because of how fragmented the domestic oil market is: of the 247 companies operating oil rigs in the U.S., 162 companies are running just one rig.[160]  Only ten companies own fifteen or more rigs–five are Defendants (EOG, Occidental, Pioneer, Diamondback, and Continental), and three of the other five are supermajors (Exxon, Chevron, and ConcoPhillips). Moreover, Defendants' market power is exacerbated by the fact that conventional oil production in the U.S. is largely fixed, and cannot quickly add or remove production volume in response to price changes.

145.    Defendants' production restraint had a demonstrable effect on the number of wells finished and rigs employed in the Permian, Eagle Ford, and Bakken Basins, the three largest shale oil plays in the United States.  Figure 15 below charts crude oil prices and Permian Basin rig counts, which have been sluggish in recovering from 2020 as a result of Defendants' agreement notwithstanding strong oil prices.

---

[157] *Id*.

[158] *Id*.

[159] Data obtained from https://oilgasleads.com/top-drilling-company/ on December 11, 2023. Figures reflect a snapshot of rigs operating in December 2023.

[160] *Id*.

**Figure 15. WTI Crude Oil Prices vs Permian Basin Rig Counts**



146.    Figure 16 below charts crude oil prices and Eagle Ford finished well counts, which have not recovered since 2020 as a result of Defendants' agreement notwithstanding strong oil prices.

**Figure 16.  Eagle Ford Completed Wells vs WTI Crude Oil Prices**



147.    Figure 17 below charts crude oil prices and Bakken rig counts, which have bottomed out since 2020 as a result of Defendants' agreement notwithstanding strong oil prices.

**Figure 17.  Bakken Rig Counts vs WTI Crude Oil Prices**



148.    OPEC believes itself to be outside the reach of the Sherman Act, so OPEC does not use code words when describing its coordination with, and the coordination amongst, Defendants: OPEC and Defendants "collaborate,"[161] "compare[] notes[s],"[162] "work together to exchange views,"[163] discuss "how [OPEC and Defendants] should proceed going forward,"[164] "further explore the mechanic of achieving [OPECs and Defendants'] common objective,"[165] and discuss OPECs and Defendants' "shared responsibility"[166] for global oil markets.

---

[161] DiChristopher, *supra* n.70.

[162] *OPEC Bulletin Special Edition*, *supra* n.56, at 51 (OPEC Secretary General Barkindo).

[163] DiChristopher, *supra* n.70.

[164] *OPEC Bulletin Special Edition*, *supra* n.56, at 51 (OPEC Secretary General Barkindo).

[165] Blas and Smith, *supra* n.37 (OPEC Secretary General Barkindo).

[166] Sam Meredith, *OPEC Calls on US Shale Oil Producers to Accept 'Shared Responsibility' of Slashing Global Supply,* CNBC (Oct. 10, 2017) (OPEC Secretary General Barkindo),

149.    Whether expressed in code words or frank terms, Defendants' agreement by and between themselves and OPEC to coordinate U.S. domestic shale oil production is *per se* illegal under the Sherman Act.

## X.    Defendants Caused Artificial Prices in the WTI Futures Market

150.    The CME (NYMEX) WTI crude oil futures market is the most important commodity contract for oil pricing. It is a highly liquid contract, with trading volume exceeding one million contracts per day. WTI futures, options, and swaps are extensively used for hedging, price discovery, and speculation in the oil market.

151.    The WTI futures contract is settled with reference to prices of oil at terminals located in Cushing. Despite its liquidity, the WTI futures contract is susceptible to manipulation. Prices of physical WTI crude oil at Cushing and WTI futures are highly correlated. Those who control physical deliveries into Cushing, such as Defendants, are able to control the futures price. As a result, manipulation of physical prices directly impacts WTI futures.

152.    Price signals from global benchmarks like WTI at Cushing are central to the functioning of oil markets. The alleged collusive agreement among the Defendants and OPEC aimed to move global prices to a higher equilibrium and sustain that price equilibrium. Inbound oil from "tight" oil fields, such as Niobrara, Bakken, and the Permian, is a key supply factor at Cushing. Over sixty percent of the inbound pipeline capacity into is coming from the Niobrara, Bakken, and the Permian basins where the Independents represent a significant percentage of overall production as well as key "swing" oil production, production more immediately responsive to price signals. As a result, Defendants actions have a significant impact on crude oil flows to

---

https://www.cnbc.com/2017/10/10/opec-calls-on-us-shale-oil-producers-to-accept-shared-responsibility.html.

WTI, Cushing.

153.    As a result, Defendants' actions in the market for physical crude oil have a direct and corresponding impact on the price of WTI crude oil futures, and the prices of physical crude oil and WTI crude oil futures converge at contract expiration.[167] The correlation among physical prices is reflected in Figure 18 below.

**Figure 18. World Oil Markets Are Correlated[168]**



Data sources: Bloomberg, Refinitiv An LSEG Business

154.    Defendants and OPEC jointly controlled swing production volumes available in global markets. Defendants also directly controlled swing production feeding into the physical settlement area for the WTI futures contract. By colluding to manipulate supply, Defendants

---

[167] *See* Danial Brusstar and Elizabeth Hui, *Tectonic Shift in the US Domestic Crude Oil Grades Market*, CME GROUP (May 21, 2020) (describing how "arbitrage price signals have responded to the global fundamentals" in crude oil grades market), https://www.cmegroup.com/education/articles-and-reports/tectonic-shift-in-the-us-domestic-crude-oil-grades-market.html; *see also* Brusstar and Karas, *supra* n.4.

[168] Graph of world crude oil prices, U.S. Energy Information Administration, *What drives crude oil prices: Spot Prices*, https://www.eia.gov/finance/markets/crudeoil/spot_prices.php (last updated June 30, 2024).

distorted price discovery in the WTI futures market during the Class Period.

155.    Defendants engage in significant production in the areas feeding directly into the

Cushing terminal, the prices of which are used to trade and settle the WTI crude oil futures contract.

These production areas are set forth in Figure 19 below.

### Figure 19. Importance of "Tight Oil" Supply from the Niobrara, Bakken, and Permian to the WTI Futures Market[169]



XI.    **Plaintiff and Members of the Putative Class Were Injured as a Result of Defendants' Manipulation**

156.    Defendants colluded amongst themselves, and with OPEC, and jointly acted to

substantially influence, control, and artificially inflate WTI crude oil futures prices.

157.    Futures contracts are standardized, exchange-traded derivative contracts. WTI

crude oil futures contracts have traded on NYMEX, now part of CME Group, since 1983. WTI

---

[169] Diagram of key crude oil pipelines inbound to and outbound from Cushing created using data from CME Group, Brusstar and Karas, *supra* n.4.

crude futures are also traded on ICE. As oil is a fundamental requirement in modern economic life and a difficult to substitute commodity crude oil futures are now one of the most important futures contracts in today's market economy.

158.    As background, a derivative is a contract between two or more parties, the value of which is based on an underlying asset (e.g., barrel of oil) or set of assets (e.g., an index, market price, or interest rate). Futures contracts, forward contracts, and options are commonly used derivatives.

159.    A commodity futures contract is a standardized bilateral agreement for the purchase and sale of a particular commodity, such as oil to be delivered at a specified location, at a specified time in the future. In the context of futures trading, a commodity is the underlying asset upon which a futures contract is based.

160.    A futures contract involves two parties connected through an exchange (e.g., the CME). The exchange acts as a central clearinghouse and guarantees both parties' performance under the contract and eliminates counterparty risk.

161.    For crude oil futures (and futures generally), the buyer commits to taking the delivery of the underlying asset and is considered "long" that underlying asset. The buyer's futures position increases in value as the underlying asset price increases. The futures buyer locks in a purchase price for the underlying asset (the futures contract price) and, assuming that buyer has no other positions, benefits if prices rise before taking delivery. Then the buyer will take delivery of the underlying asset at the earlier, lower futures contract price rather than the higher, prevailing market price at the time of delivery. According to CME Group literature, futures contracts provide refiners and other end users the opportunity to hedge against the risk of price increases by locking in fixed future prices.

162.    The seller of a futures contract commits to delivering the underlying asset and is considered "short" on the underlying asset. The value of the seller's futures position will increase as the underlying asset price decreases. The seller locks in a sale price for the underlying asset (the futures contract price) and benefits if prices fall before making delivery. Then the seller will make delivery of the underlying asset at the earlier, higher futures contract price rather than the prevailing market price at the time of delivery.

163.    Rather than making or taking delivery of the physical underlying asset, futures market participants almost always offset their futures contracts prior to the delivery deadline. For example, a purchaser of one WTI futures contract can eliminate the obligation to take delivery of the crude oil by selling one WTI futures contract of the same type. The difference between the initial purchase price and the subsequent sale price represents the realized profit or loss for the trader. The trader's position goes from "long" on one contract to "flat" after the offsetting sale.

164.    Conversely, a seller of one WTI futures contract can eliminate the obligation to make delivery of the underlying oil by buying one WTI futures contract of the same type. The difference between the initial futures contract sale price and the subsequent futures contract purchase price represents the realized profit or loss for the trader. The trader's position goes from "short" one contract to "flat" after the offsetting purchase.

165.    As for options, an options contract comes in two forms: a "call option" and a "put option." The buyer (sometimes called the "holder") of a call option has the "option"–a right, but not an obligation–to purchase the underlying asset at a set price (the "strike price"). The seller (sometimes called the "writer") of a call option has the obligation–it is not a mere "option" or "right"–to deliver the underlying asset at the strike price if the buyer exercises its right of purchase.

166.    The buyer of a put option has the "option" a right, but not an obligation–to sell the

underlying asset at a set price (the "strike" or "exercise" price). The seller of a put option has the obligation–it is not a mere "option" or "right"–to buy the underlying asset at the strike price if the buyer exercises its right to sell.

167.    The purchase or sale price of an option is often referred to as a "premium." The option buyer pays the option purchase price (or premium) to the seller. This price is different than the "strike" price. The option price is simply the price the buyer pays to have the option to buy (or sell) the futures contract at the strike price.

168.    A trader's long call option increases in value when the price of the underlying asset increases; a trader's long put option increases in value when the price of the underlying asset decreases.

169.    For call options on futures contracts, the option becomes "in the money" when the underlying futures price exceeds the call option strike price. For a put option, the option becomes "in the money" when the underlying futures price is below the put option strike price.

170.    When the call option strike price is above the futures price, or the put option strike price is below the futures price, the option is said to be "out of the money." There is no reason to exercise the option because the underlying asset (the futures contract) can be bought for less (in the case of a call option) or sold for more (in the case of a put option) in the futures market. The option generally will not be exercised by the holder. It will "expire worthless," and the option seller will pocket the sale price (the premium) without having to make delivery.

171.    The Cushing hub provides the physical delivery mechanism for the NYMEX WTI futures contract. When the contract was listed in 1983, Cushing provided a nexus of pipelines, refineries, and storage terminals that facilitated an active cash market for crude oil. Cushing is now a key nexus for global crude oil with over thirty inbound and outbound pipelines and sixteen major

storage terminals.[170] Nearly 4 million barrels per day of inbound pipeline capacity to Cushing delivers crude oil streams produced in Canada and the U.S. shale basins such as the Bakken, Niobrara, and Permian.

172.    The settlement price for WTI futures is cash settled against the prevailing market price for U.S. light sweet crude oil. The main delivery point for physical exchange and price settlement of WTI crude oil futures is Cushing, Oklahoma. A commercial company that elects to take delivery after the expiration of the WTI futures contract must have storage and/or pipeline capacity connected to one of the NYMEX delivery locations in Cushing. From there, the firm can elect to take the oil into storage or into a pipeline with connectivity to PADD District 2 refineries and to the Gulf Coast market. The physical-delivery requirement of WTI futures provides a direct link to the underlying physical market, and futures also provide the security of a financially guaranteed clearinghouse for buyers and sellers.

173.    WTI futures are carefully designed to provide a direct link to the spot market conditions for the WTI commodity, and as a result WTI is an important reference price for oil delivered at other points throughout the U.S. system.

174.    Refiners, airlines, haulers, commodity traders, shippers, and other commodity market participants, as well as investors utilize WTI as well as other futures (such as Brent crude oil) and options (calls, puts, etc.) on futures to manage price risk to crude oil. A general trend toward greater awareness of risk management has also contributed to the growth in the popularity of the WTI contract with firms using a futures position as a form of "price insurance" to avoid downside risks if they are a producer, or upside risks (cost exposure) if they are a consumer.

---

[170] Brusstar and Karas, *supra* n.4.

175.    WTI is one of the most significant commodity contracts in existence. Trading of WTI futures regularly exceeds one million contracts per day. One WTI futures contract represents 1,000 barrels (42,000 gallons) of crude oil. At a price of $100 per barrel, the total notional value of crude oil underlying the WTI futures market on a typical one million contracts trading day is approximately $100 billion.

176.    WTI's importance "has also extended way beyond its U.S. heartland. A major buildout of pipeline and port infrastructure has linked WTI's delivery point of Cushing, Oklahoma to the world via the export terminals of the U.S. Gulf Coast."[171]

177.    WTI also plays an important role in related exchange traded products—for instance, the RBOB (Reformulated Blendstock for Oxygenate Blending) gasoline product traded on the CME. Since RBOB gasoline is produced from oil, the pricing dynamics of WTI directly impact RBOB futures.[172]

178.    Generally, the prices of futures contracts are closely related to the price of the underlying commodity product. This is particularly true for a market as large and liquid as Oil Futures. Figure 20 below shows how price signals correlated and converged during the period of COVID-19 demand shock and unprecedented occurrence in oil commodities markets.

---

[171]    Owain Johnson, *How WTI Became the Most Important Commodity Contract on the Planet*, OPENMARKETS (Mar. 23, 2023), https://www.cmegroup.com/openmarkets/energy/2023/how-wti-became-the-most-important-commodity-contract-on-the-planet.html.

[172]    WTI Insights by PVM, CME GROUP (Aug. 10, 2023), https://www.cmegroup.com/newsletters/wti-insights-by-pvm/wti-insights-by-pvm-2023-08-10.html.

**Figure 20. Relationship Between Physical and Financially Settled Oil (USD)**[173]



179.    As alleged, Defendants manipulated WTI futures, as discussed above, by conspiring to suppress production and thus raise the price of physical oil throughout the Class Period. This anticompetitive suppression had a direct and corresponding price impact on WTI futures prices due to the close relationship between WTI futures and production and pricing of the commodity.

180.    As the following figures from the EIA show, non-OPEC supply dynamics are a key input driving WTI and other oil benchmarks.

---

[173] Graph showing U.S. cash grades compared with WTI, Cushing futures prices, Brusstar and Karas, *supra* n.4.

**Figure 21. Key Drivers of Oil Prices[174]**



**Figure 22. Key Drivers of Oil Prices[175]**

---

[174] Diagram of crude oil supply and demand factors, U.S. Energy Information Administration, *What Drives Crude Oil Prices?*, https://www.eia.gov/finance/markets/crudeoil/index.php (last accessed July 22, 2024).

[175] Graph of changes in non-OPEC production and WTI crude oil prices, U.S. Energy Information Administration, *What Drives Crude Oil Prices?* (June 11, 2024).

181.    WTI is one of the world's most traded commodities, and the price of WTI is the basis for a long line of other less-traded benchmarks that discount their oil relative to how WTI is trading.[176]

182.    Defendants' tight oil production feeds directly into the pipelines leading to the Cushing physical settlement location. Defendants account for a significant percentage of the domestic production into Cushing from tight oil production areas with in-bound pipeline capacity to Cushing. Therefore, Defendants had the ability to influence the prices of crude oil at the Cushing settlement, the commodity underlying the WTI crude oil futures contract.

183.    In addition to the WTI Crude Oil futures contracts, a number of other CME and ICE Futures contracts are tied to the price of crude oil at the Cushing terminal.

## XII.    Plus Factors Indicative of Defendants' Conspiracy to Manipulate the Price of WTI and Related Derivative Products

184.    The presence of a number of factors, referred to as "plus factors" and "super plus factors" render the U.S. shale oil industry highly conducive to collusion. Plus factors are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[177] "Super plus factors are actions or outcomes that would almost never be observed in the absence of collusion, [such that], it is reasonable to presume that the cartel finds these conducts or outcomes important to the implementation and operation of the collusive structures."[178]

---

[176] Nick Cunningham, *Is the Cushing Oil Hub Still Relevant?*, OILPRICE (Apr. 11, 2018), https://oilprice.com/Energy/Crude-Oil/Is-The-Cushing-Oil-Hub-Still-Relevant.html.

[177] William E. Kovacic, et al., *Plus Factors and Agreement in Antitrust Law*, 110 MICH. L. REV. 393, 393 (2011).

[178] *See id.* at 426.

185.    The following plus and super plus factors alleged herein support an inference that Defendants' actions constituted a *per se* unlawful price-fixing conspiracy, not merely parallel conduct:

a.    The market conditions for U.S. crude oil are favorable to collusion. As discussed above, the U.S. shale oil industry is highly fragmented, with a small number of larger producers and hundreds of smaller producers.  These larger producers (Defendants) have excess capacity and industry trade associations they regularly take part in, giving them ample time and opportunity to coordinate supply restraints and curtail cheating on the conspiracy. As detailed above, Defendants did in fact meet during trade association gatherings, including annually at the CERAWeek Conference in Houston, Texas, to discuss their internal cooperation and the overall cooperation with OPEC by all Defendants to maintain that excess capacity.

b.    The market conditions for crude oil sold in the U.S. are susceptible to the price effects of collusion because it, and the downstream products for which it is the key input, is a daily-use commodity that has no substitute for many purchasers and  high switching costs for the remainder, leading to highly inelastic demand. Defendants' actions were against Defendants' independent self-interests but for the existence of an agreement.  As detailed above, Defendants repeatedly met  with each other and OPEC representatives and discussed amongst themselves and with OPEC representatives their confidential business plans, including forward-looking production and capacity information.  No rational business would share

78

this proprietary and competitively sensitive information with a direct competitor, absent collusion.

c.    Following these exchanges, Defendants then decided not to increase their respective production volumes when that would have been in their individual rational economic best interests, given rising prices. Instead, Defendants withheld production in a manner that would only be in their individual rational economic best interests if Defendants had an agreement between themselves and OPEC to coordinate production levels so as to maintain crude oil prices at artificially high levels. Defendants repeatedly communicated forward-looking production data and publicly commented on each other's production announcements in a manner that would be irrational, absent an agreement.

186.    Defendants' agreement to constrain shale oil production has inflated the price of crude oil and WTI-based crude oil derivatives throughout the Class Period. Historically, global crude oil demand was primarily met by oil obtained from conventional drilling. Following the Shale Revolution, the influence of U.S. shale production on crude oil prices (and gasoline prices) is undeniable, a fact recognized by market analysts and economists.

187.    A *Forbes* article from 2019 claims that "without the U.S. shale oil boom, [crude] oil prices would have never dropped back below $100/bbl" because since 2008, "U.S. oil production increased by 8.5 million bpd–equal to 73.2% of the global increase in production."[179]

---

[179] Robert Rapier, *The U.S. Accounted for 98% of Global Oil Production Growth in 2018*, FORBES (June 23, 2019), https://www.forbes.com/sites/rrapier/2019/06/23/the-u-s-accounted-for-98-of-global-oil-production-growth-in-2018/?sh=249e989b5125.

a.    In a 2017 article titled "The oil market in the age of shale oil," economists concluded that, since 2014, US shale oil has affected oil prices by increasing global crude oil supply and influencing OPEC policies.[180]

b.    In October 2019, the Executive Office of the U.S. President's Council of Economic Advisors declared that the U.S. shale revolution has "reduced the global price of oil by 10 percent" since 2007.[181]

c.    In 2020, economists from the Federal Reserve Bank of Dallas found that without the shale oil revolution, oil prices would have risen by 36% in 2018.[182]

d.    In 2023, an article in the International Journal of Energy Economics and Policy states that, in the past, "[t]he increase in US crude oil production, driven by shale oil . . . significantly increased oil supply, directly affecting the price of crude oil…."[183]

188.    As noted above, U.S. Independents' output decisions have a disproportionate impact on the price of crude oil and crude oil derivatives because they are swing producers for the global market.[184]  When competing with each other (and OPEC), as the largest Independents in a very fractured production landscape, Defendants have sufficient market power to dictate whether

---

[180] Irma Alonso Alvarez and Virginia Di Nino, *The Oil Market in the Age of Shale Oil*, 8 ECB ECON. BULLETIN, 57-74 (2017).

[181] *The Value of U.S. Energy Innovation & Policies Supporting the Shale Revolution*, COUNCIL OF ECON. ADVISORS (Oct. 2019), https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/10/The-Value-of-U.S.-Energy-Innovation-and-Policies-Supporting-the-Shale-Revolution.pdf.

[182] Nathan S. Balke, et al., *The Shale Revolution and the Dynamics of the Oil Market*, FED. RESERVE BANK OF DALLAS (June 17, 2020), https://www.dallasfed.org/-/media/documents/research/papers/2020/wp2021.pdf.

[183] Rodhan, *supra* n.29, at 433-43.

[184] Lee, *supra* n.26.

the U.S. can produce enough shale oil in response to high crude prices to "swing" the market and push prices down.

189.    Defendants acknowledge that they have this power, and are choosing not to use it. For example, on March 2, 2022, the *New York Times* reported that, "[e]xecutives of several companies, including [Defendant] Pioneer Natural Resources . . . and [Defendant] Continental Resources, have said in recent days that they were committed to limiting production to avoid oversupplying the market and pushing down prices."[185]

190.    Since at least 2021, Defendants have collectively coordinated their production decisions, leading to production growth rates lower than would be seen in a competitive market, despite high oil prices and healthy global demand.

191.    Despite production increases from supermajors and smaller private producers, Defendants' production restraint has had a considerable impact on total U.S. shale production. In 2022, U.S. shale oil production increased by only 500,000 barrels, which was 50% short of market analysts' general yearly estimates.[186]

192.    As discussed more fully above, during the Class Period, Defendants openly admitted that they were not operating at full drilling capacity and affirmatively argued that operating at less than full capacity was a strategy decision to increase profits.

193.    Over sixty percent of the inbound pipeline capacity into Cushing comes from the Niobrara, Bakken, and the Permian basins where the Defendants represent a significant percentage of overall production as well as key "swing" oil production, production more immediately

---

[185] Stanley Reed, *As Oil Soars, OPEC and Its Allies Decline to Offer Relief*, THE N.Y. TIMES (Mar. 2, 2022), https://www.nytimes.com/2022/03/02/business/oil-prices-opec.html.

[186] Eric Rosenbaum, *Oil CEOs Are Doubling Down on Buybacks as Biden Budget Seeks to Quadruple Tax,* CNBC (Mar. 7, 2023), https://www.cnbc.com/2023/03/07/oxy-ceo-doesnt-seem-worried-about-politics-of-buybacks-gas-prices.html.

responsive to price signals. The collusive behavior outlined above allowed manipulation of price signals from global benchmarks like WTI, Cushing which interferes with the functioning of oil markets. The aim of the collusive agreement among the Defendants and OPEC was to move global prices to a higher equilibrium and sustain that price equilibrium. Defendants' collusion to suppress inbound oil and production from "tight" oil fields, such as Niobrara, Bakken, and the Permian, is a key supply factor creating market artificiality for the formation of "benchmark" pricing for WTI at Cushing during the Class Period.

194.    There are significant opportunities to collude and interfirm communications that are contributory factors allowing for collusion to artificially manipulate pricing. Defendants are involved in multiple industry trade associations and regularly attend trade meetings, giving them ample time and opportunity to coordinate supply restraints and curtail cheating on the conspiracy. As detailed above, Defendants did in fact meet during trade association gatherings, including annually at the CERAWeek Conference in Houston, Texas, to discuss their cooperation with each other and the collective cooperation with OPEC by all Defendants to maintain that excess capacity, extract less crude oil, and manipulate crude pricing.

195.    There is a high level of interfirm communication and coordination between Defendants, beyond what is described above:

a.    A fracking consultant who worked for both EOG and Centennial during the Class Period explained that most major operators in the Midland Basin "all work together to share resources" even though "it may seem like they are competitors." The former consultant witnessed instances where Centennial asked EOG to modify its fracking schedule to accommodate Centennial's production plans. He said that "gentleman's agreements" are prevalent in the U.S. shale industry. A former

engineer at Hess during the Class Period disclosed that Hess executives routinely had round-table discussions with other operators in the Bakken Basin, a major shale play in North Dakota, to discuss certain best practices.

b.    A former senior construction manager at Hess during the Class Period confirmed that Hess "collaborated all the time with other production companies," and he personally attended a regular in-person roundtable with "all top tier producers," including EOG and Continental, to discuss extraction processes, measuring wells, and other construction and operation methods.

c.    A former Senior Lease Operator at Diamondback said that Diamondback often collaborated with other Shale Oil producers, like Pioneer, to share water supplies.

196.    Each of these get-togethers among Defendants provided additional opportunities to collude.

197.    The Defendants' core shareholders overlap substantially (with Continental, which founder Howard Hamm took private in 2022, the lone exception):

**Table 2: Defendants' Common Ownership**

| Defendant | Shareholder | | | | | |
|---|---|---|---|---|---|---|
| | BlackRock, Inc. | Capital World Investors | FMR LLC (Fidelity) | State Street Corp. | T. Rowe Price | Vanguard Group Inc. |
| Permian | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Chesapeake | ✔ | ✔ | ✔ | ✔ | | ✔ |
| Diamondback | ✔ | ✔ | | ✔ | | ✔ |
| EOG | | | | | | |
| Hess | ✔ | | ✔ | ✔ | ✔ | ✔ |
| Occidental | ✔ | | | ✔ | | ✔ |
| Pioneer | ✔ | ✔ | | ✔ | ✔ | ✔ |

198.    The fact of the Defendants' common investor ownership creates an additional factor enabling and facilitating Defendants' agreed output restrictions.

199.    First, because the Defendants were largely owned by many of the same shareholders, OPEC's direct communications with these shareholders supplemented OPEC's

direct communications with the Defendants and facilitated Defendants' coordinated output restriction.

200.    Second, the shareholders' participation in Defendants' relationships with each other, and with OPEC, served as an enforcement mechanism for the agreement to restrict output. The shareholders' expressed concerns about output–or "capital discipline," in Wall Street-speak– became a stick used to ensure that the Defendants adhered to their agreement and its goals.[187]

201.    Third, the Defendants' common shareholders incentivized Defendants not to compete amongst themselves.  When competitors in an industry share common owners, "[e]conomic theory has long shown that horizontal shareholdings can reduce the incentives of horizontal competitors to compete with each other."[188]  That literature explains that a profit maximizing producer will seek to expand its market share through production increases when the additional revenue obtained outweighs its interest in keeping market-wide prices high.  When ownership is separate, economic models prove that firms have incentives to undercut rivals' prices, including through expanding production, because the profits those firms gain from the additional sales exceed the reduction in the market price caused by their own conduct.[189]

202.    The premise on which these models rest is "that when a firm takes away sales by undercutting its rivals' prices, the firm's owners gain the profits from those sales but lose no profit on the sales taken away from their rivals."[190]

---

[187] Complaint at ¶ 4, *In the Matter of Exxon Mobil Corp.*, File No. 241-0004 (May 1, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/2410004exxonpioneercomplaintredacted.pdf.

[188] Einer Elhauge, "Horizontal Shareholding," 129 Harv. L. Rev. 1267, 1268 (March 2016).

[189] *See id.* at 1269.

[190] *Id.* at 1269.

203.    But where the industry involves common ownership, a firm that expands its production and/or cuts its price "simply moves their owners' money from one pocket to another," with the result that "the net effect of the price cut for those owners is that the prices charged by both firms are lower, thus lowering those owners' profits across both firms."[191]

204.    Defendants' common shareholders—some of the largest financial firms in the world—had no interest in any particular Defendant winning market share from any other Defendant by increasing output.  Instead, these shareholders' interests were served by Defendants keeping market-wide crude oil and crude oil derivative fuel product prices high by restricting output in coordination with OPEC.[192]

205.    Defendants' actions were against Defendants' independent self-interests but for the existence of an agreement.  As detailed above, Defendants repeatedly met with each other and OPEC representatives and discussed between and among themselves and with OPEC representatives their confidential business plans, including forward-looking production and capacity information.

206.    No rational business would share this proprietary and competitively sensitive information with a direct competitor, absent collusion.

207.    OPEC representatives described the years-long discussions with U.S. shale producers, including Defendants, using words like "collaborate" and "shared responsibility" for the health of the global oil market.[193]

---

[191] *Id.* at 1269.

[192] *Id.* at 1274 ("The basic anticompetitive effects arise from the fact that interlocking shareholdings diminish each individual firm's incentives to cut prices or expand output by increasing the costs of taking away sales from rivals.").

[193] *See supra* ¶¶ 93, 95, 106, 119, 148, 195.

208.    No rational business would work to "collaborate" with its direct competitors in furtherance of a "shared responsibility" for market-wide prosperity, absent collusion.

209.    Following these mutual exchanges, Defendants would decide not to increase their respective production volumes, even though an increase was in their individual rational economic best interests, given rising prices. Some Defendants also appeared to withdraw downside hedging pricing protection consistent with conviction of artificially constrained supply.

210.    Defendants had excess capacity, but each Defendant adhered to a self-imposed restraint on production growth.  Indeed, Individual Defendant Sheffield claimed in February 2022 that Defendants would not increase production at any price.[194]

211.    Refusing to increase production in an environment of excess capacity and profitable market prices is irrational, absent supplier collusion.

212.    Each Defendant's individual production restraint would not have held unless a critical mass of Defendants had an agreement to restrain production.  Continuing production restraint in the face of extremely high prices would only be in each Defendant's individual rational economic best interests if Defendants had an agreement between themselves and OPEC to coordinate production levels to maintain crude oil prices at artificially high levels.

213.    Finally, Defendants repeatedly communicated forward-looking production data to the press and publicly commented on each other's production announcements in a manner that would be irrational, absent an agreement.

---

[194] *See supra* ¶ 123.

## XIII.    Recent Regulatory Investigations

214.    On May 2, 2024, the Federal Trade Commission ("FTC") announced that it had reached a consent decree with ExxonMobil in connection with ExxonMobil's then-pending acquisition of Defendant Pioneer (the merger, the "Exxon-Pioneer Merger").[195]

215.    This decree forbade Defendant Pioneer's former-CEO, Individual Defendant Scott Sheffield, from joining Exxon's Board of Directors based on FTC's evidence of Sheffield's years-long efforts to fix the price of crude oil.[196]

216.    The decree follows from an FTC administrative complaint (the "FTC Exxon Complaint"), which was released in redacted form on May 1, 2024.  The FTC Exxon Complaint states:

> Through public statements and private communications, Pioneer founder and former CEO Scott D. Sheffield has campaigned to organize anticompetitive coordinated output reductions between and among U.S. crude oil producers, and others, including the Organization of Petroleum Exporting Countries ("OPEC"), and a related cartel of other oil-producing countries known as OPEC+. Mr. Sheffield's communications were designed to pad Pioneer's bottom line–as well as those of oil companies in OPEC and OPEC+ member states–at the expense of U.S. households and businesses.

FTC Exxon Complaint, ¶ 1.

217.    The FTC Exxon Complaint references documents, including Mr. Sheffield's WhatsApp and text messages, that Defendant Pioneer produced to the FTC as part of the FTC's review of the Exxon-Pioneer Merger.  *See id.*, ¶¶ 5-6.

---

[195] *See* Press Release, *FTC Order Bans Former Pioneer CEO from Exxon Board Seat in Exxon-Pioneer Deal*, U.S. FED. TRADE COMM'N (May 2, 2024), https://www.ftc.gov/news- events/news/press-releases/2024/05/ftc-order-bans-former-pioneer-ceo-exxon-board-seat-exxon- pioneer-deal.

[196] Consent Order, *In the Matter of Exxon Mobil Corp.*, File No. 241-0004 (May 1, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/2410004exxonpioneerorderredacted.pdf.

218.    Specifically, the FTC alleged that documents produced by Defendant Pioneer as part of the FTC's Exxon-Pioneer Merger investigation revealed:

a.    In 2020, Defendant Sheffield's "close communications with high-ranking OPEC officials [] during the early days of the COVID pandemic [] focused on [] Sheffield's efforts to limit Permian oil production in the face of falling oil prices globally." *Id.*, ¶ 38;

b.    Even after the economy and oil prices recovered from the COVID pandemic, "[Defendant] Sheffield did, in fact, stay in regular contact" with OPEC officials, *id.*, ¶¶ 39-40, and has "exchanged information on oil pricing and output with OPEC representatives." *Id.*, ¶ 41;

c.    Over the past few years, Defendant Sheffield has, through "text messages," "in-person meetings," and other means of communication, "discuss[ed] crude oil market dynamics, pricing, and output" with Pioneer's U.S. competitors. *Id.*, ¶¶ 6, 36;

d.    Defendant Sheffield served as a "conduit" between Defendants and OPEC, *id.*, ¶ 41; and "also worked to facilitate communications between his competitors in the Permian Basin and OPEC." *Id.*, ¶¶ 41-42; and

e.    Defendant Sheffield, through "WhatsApp" messages and other means of communication, "held repeated, private conversations with high-ranking OPEC representatives assuring them that Pioneer and its Permian Basin rivals were working hard to keep oil output artificially low," *id.*, ¶ 5, "and to discuss U.S. producers' efforts to maintain capital discipline in order to increase Pioneer's profits." *Id.*, ¶ 34.

219.    Among other facts, Sheffield recently admitted that he exchanged WhatsApp messages with a government minister and acknowledged that those messages were referenced in the FTC complaint.  *See* Comment on Behalf of Scott Sheffield, *In the Matter of Exxon Mobil Corp.*, File No. 241-0004 (F.T.C. May 28, 2024), at 21 (claiming that the messages referred to in the FTC Complaint "were entirely innocuous").

220.    FTC Chair Lina Khan summarized the Exxon-Pioneer Merger investigation findings:

> A core principle that should underpin the Commission's antitrust analysis is examining and understanding commercial realities. Sometimes the evidence that is most probative of commercial realities is how market participants act. Staff's investigation here uncovered troubling evidence of Pioneer CEO Scott Sheffield's actions and communications, which make clear that he believed and acted as if he could persuade his rivals to join him in colluding to restrict output and raise prices. When market actors speak and act as if they can collude, we should not ignore this direct evidence[.][197]

221.    Contemporaneous public reporting suggests that Defendant Pioneer submitted "millions of documents" to the FTC–hundreds of which were communications between Defendant Sheffield, Pioneer's competitors, and/or OPEC–as part of the agency's second-level review into the Exxon-Pioneer Merger's possible anticompetitive effects.

222.    On May 2, 2024, it was also reported that the FTC had uncovered hundreds of text messages between Defendant Pioneer's then-CEO, Defendant Sheffield, and other individuals that reflected efforts to collude with the other Defendants, and with OPEC, to inflate crude oil prices.[198] "Mr. Sheffield did not limit himself to public signaling to US counterparts—he has also held

---

[197] *Statement of Chair Lina M. Khan Joined by Commissioner Rebecca Kelly Slaughter and Commissioner Alvaro Bedoya in the Matter of Chevron Corporation and Hess Corporation*, U.S. FED. TRADE COMM'N (Sept. 30, 2024), https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/statement-chair-lina-m-khan-joined-commissioner-rebecca-kelly-slaughter-commissioner-alvaro-bedoya-1.

[198] Matt Egan, *American oil tycoon accused of trying to conspire with OPEC to inflate prices*, CNN (May 2, 2024), https://www.cnn.com/2024/05/02/energy/oil-ceo-opec-scott-sheffield/index.html.

repeated, private conversations with high-ranking OPEC representatives assuring them that Pioneer and its Permian Basin rivals [*i.e.*, Defendants] were working hard to keep oil output artificially low."[199]

223.    The FTC's Exxon Complaint applies redactions to the contents and contacts involved in the text messages, and the text messages are not attached as an exhibit to the complaint and are not made publicly available.

224.    While the FTC's Exxon Complaint did not include information on the text messages, Defendant Sheffield responded to the FTC Order in a letter on May 28, 2024. This letter included snippets of text messages including one text sent to his son the CEO of Parsley Oil, in June 2020 that reads, "Just got off phone with UAE oil minister. OPEC plus is upset with Parsley and EOG public statements about bringing on production."[200]

225.    On July 19, 2024, it was reported that the FTC had begun investigating collusion among U.S. domestic crude oil producers—including Defendants—and OPEC.[201] The focus of the investigation appears to be on entities that produce crude oil from tight oil production areas, including the Permian Basin, which feed directly into the Cushing physical settlement area. Among other entities, the FTC is investigating Defendants Hess, Occidental, and Diamondback.[202]

226.    On June 26, 2024, Sheldon Whitehouse, the Chairman of the Senate Committee on the Budget, sent a document and information request to Defendant John Hess. He noted that the

---

[199] *Id.*

[200]    Comment    on    Behalf    of    Scott    Sheffield    at    20    (May    28,    2024), https://subscriber.politicopro.com/f/?id=0000018f-bfe8-dc27-a38f-bffa60950000.

[201] Mitchell Ferman, Leah Nylen and Jennifer Dlouhi, *FTC Eyes Oil Bosses' Texts for Signs of Collusion with OPEC*, BLOOMBERG (Jul. 19, 2024), https://news.bloomberglaw.com/environment-and-energy/ftc-eyes-oil-executives-texts-for-signs-of-collusion-with-opec.

[202] *Id.*

FTC's findings indicate that Defendants Sheffield and Pioneer may not have been the only individual or entity engaging in such collusive activities. The FTC's Complaint stated that "[t]hrough public statements, text messages, in-person meetings, WhatsApp conversations and other communications while at Pioneer, Sheffield sought to *align oil production across the Permian Basin in West Texas and New Mexico with OPEC+*." Similarly, the FTC also indicated that Defendant Sheffield had discussed with OPEC representatives and officials "his efforts to coordinate with *Texas producers* under a production cut mandated by the Railroad Commission of Texas."[203] Communications with OPEC and other oil producers were requested from Defendant John Hess.[204] The same demand letter was sent to Defendants Diamondback and Occidental on June 26, 2024.[205]

227.    On July 9, 2024, the U.S. House Committee on Natural Resources sent the U.S. Department of Interior a letter regarding the alleged conspiracy among Defendants with each other and with OPEC and OPEC+ nations to reduce output.[206] The letter states "[s]uch market manipulation would have enormous impacts on the price of gas . . . ."[207] The letter further states that "Pioneer was not the only U.S. oil company that was colluding with OPEC and OPEC+."[208]

---

[203]    Sheldon    Whitehouse,    Letter    to    John    B.    Hess    (June    26,    2024), https://www.budget.senate.gov/imo/media/doc/6.26.24%20OPEC%20Collusion%20Letters-part-Hess.pdf.

[204] *Id.*

[205]    Sheldon    Whitehouse,    Letter    to    Travis    Stilce    (June    26,    2024), https://www.budget.senate.gov/imo/media/doc/6.26.24%20OPEC%20Collusion%20Letters-part-Diamondback%20Energy.pdf; *see also* Sheldon Whitehouse, Letter to Vicki Hollub, https://www.budget.senate.gov/imo/media/doc/6.26.24%20OPEC%20Collusion%20Letters-part-Occidental.pdf.

[206] U.S. House of Representatives Committee on Natural Resources, Letter to U.S. Department of the Interior    (July    9,    2024),    https://democrats-naturalresources.house.gov/imo/media/doc/2024-07-09%20MOC%20Letter%20to%20DOI%20re%20OPEC%20collusion.pdf.

[207] *Id.*

[208] *Id.*

Defendant Pioneer's CEO Defendant Sheffield "publicly told competitors," i.e., the Defendants, "that they should be 'disciplined' about capacity growth and 'stay[] in line.'"[209] In private conversations with OPEC leaders, Defendant Sheffield stated that Pioneer and its Permian Basin rivals were working hard to keep oil output artificially low.[210]

228.    On September 30, 2024, the FTC announced that it had reached a consent decree with Chevron in connection with Chevron's pending acquisition of Defendant Hess (the merger, the "Chevron-Hess Merger").[211]

229.    The decree follows from an FTC administrative complaint (the "FTC Chevron Complaint") that was released in redacted form on September 30, 2024.[212]  The FTC Chevron Complaint states, in part:

> Hess Chief Executive Officer ("CEO") John B. Hess ("Mr. Hess") has communicated publicly and privately with OPEC representatives and oil ministers of OPEC member states about global output and other dimensions of crude oil market competition.
>
> Mr. Hess encouraged high-level OPEC representatives in their stated mission to stabilize global oil markets.

FTC Chevron Complaint, ¶¶ 4-5.

230.    The FTC Chevron Complaint further alleges that "Hess's ordinary course documents demonstrate that, as Hess's CEO and Director, Mr. Hess had access to and connections with OPEC Oil Producers, his market rivals" and that "Mr. Hess attended public meetings and

---

[209] *Id.*

[210] *Id.*

[211] *See* Press Release, *FTC Order Bans Hess CEO from Chevron Board in Chevron-Hess Deal*, U.S. FED. TRADE COMM'N (Sept. 30, 2024), https://www.ftc.gov/news-events/news/press- releases/2024/09/ftc-order-bans-hess-ceo-chevron-board-chevron-hess-deal.

[212] FTC Administrative Complaint, *In the Matter of Chevron Corp.*, File No. 241-0008 (Sept. 30, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/Chevron-Hess-Complaint.pdf.

maintained private communications with OPEC representatives during [his CEO tenure]." *See id.*, ¶ 26.

231.    Specifically, the FTC alleged that documents produced by Hess as part of the FTC's Chevron-Hess Merger investigation revealed continuous coordination:

a.    A lengthy history of communications and meetings between Defendant John Hess and OPEC Secretary General Barkindo, including several of the communications and meetings described above. *Id.*, ¶¶ 27-40;

b.    Years-long communications and meetings between Defendant John Hess and subsequent OPEC Secretary General Al Ghais. *Id.*, ¶¶ 41-43;

c.    Extensive private communications with Saudi Arabian oil executives at Saudi Aramco, the national oil company of Saudi Arabia and fourth-largest company in the world by revenue. *Id.*, ¶¶ 44-47;

d.    Defendant John Hess's public statements regarding the interplay between U.S. shale producer and OPEC production levels, and the impact of those production levels on world crude oil prices, featured "repeated themes from his private communications about market stability and other business topics that he had with Messrs. Barkindo, Al Ghais, and [the Saudi Aramco executives]." *Id.*, ¶ 48; and Defendant John Hess's statements to investors about OPEC's role in influencing global crude oil prices while acting as CEO were "consistent with his private communications with OPEC representatives." *Id.*, ¶ 49.

232.    Importantly, FTC Chair Lina Khan explicitly linked the FTC's actions related to the Exxon-Pioneer Merger and the Chevron-Hess Merger–further reinforcing the allegations above

that ***both*** Defendants Pioneer and Hess were coordinating with OPEC ***at the same time and in a similar manner***:

> The Commission's actions in Chevron-Hess and Exxon-Pioneer mark an important step towards ensuring that U.S. oil producers are serving as a competitive check on OPEC+ rather than subordinating their independent decision-making to the goals set by a cartel. . . . Rivals responding to one another by increasing production, rather than coordinating to hold it back, represents the type of competitive dynamic the antitrust laws were designed to protect.[213]

## CLASS ALLEGATIONS

233.    Plaintiff brings this action on behalf of themselves, and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedures, on behalf of all members of the following class:

> All persons or entities that engaged in a U.S. based transaction of WTI-based derivatives during the period of at least January 1, 2021 through the present (the "Class Period"). A U.S. based transaction in WTI-based derivatives includes: (a) a purchase or sale of a WTI crude oil futures (or options on futures) contract or other futures or options tied to the price of WTI crude oil on a futures exchange in the U.S.; and/or (b) a purchase or sale of a WTI crude oil swap, forward agreement, or other financial instrument benchmarked, priced, and/or settled to WTI entered into by a U.S. person or entity from a location within the U.S.

234.    Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, and affiliates. Also excluded is the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

235.    Members of the Class are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Class are readily identifiable from information and records in the possession of third parties. Members of the Class are readily identifiable from information and records in the possession of the CME, other digital exchange providers, or are capable of identification via third parties.

---

[213] Khan Statement, *supra* n. 197.

236.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and members of the Class were damaged by the same wrongful conduct of Defendants.

237.    Plaintiff will fairly and adequately protect and represent the interests of members of the Class. The interests of Plaintiff are coincidental with, and not antagonistic to, those of members of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' wrongful conduct in that they transacted WTI-based derivatives at artificial prices. Plaintiff and all members of the Class are similarly affected by Defendants' course of conduct in violation of the CEA.

238.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members, thereby making relief with respect to members of the Class as a whole appropriate. Questions of law and fact common to members of the Class include, but are not limited to:

a.    whether Defendants' conspired to fix, raise and maintain the prices of WTI crude oil and WTI futures prices;

b.    whether Defendants' conduct had the impact of raising WTI crude oil and WTI futures prices;

c.    whether Defendants' conduct violated the Sherman Act;

d.    whether Defendants are liable to the Class for treble damages under the Sherman Act and the Clayton Act;

e.    whether Defendants' manipulated the prices of WTI crude oil, the commodity underlying the WTI futures contract, and the prices of WTI futures contract;

f.    whether Defendants intended to manipulate the prices of WTI crude oil;

g.    whether Defendants intended to manipulate the prices of the WTI futures contract;

h.      whether Defendants had the ability to influence the prices of WTI crude oil;

i.      whether Defendants had the ability to influence the prices of the WTI futures contracts;

j.      whether the price of WTI crude oil was artificial;

k.      whether WTI futures prices were artificial;

l.      whether Defendants caused artificial prices of WTI crude oil and WTI futures;

m.      whether Defendants' conduct violated the CEA's anti-manipulation provisions;

n.      whether Defendants aided and abetted violations of the CEA; and

o.      the appropriate type and scope of injunctive and related equitable relief.

239.    A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many members of the Class who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

240.    The Class is ascertainable because it is defined by objective criteria based on instruments traded.

241.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

242.    Plaintiff has defined members of the Class based on currently available information and hereby reserve the right to amend the definitions of members of the Class, including, without limitation, the length of the Class Period.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

243.    By its very nature, the unlawful activity alleged herein that Defendants engaged in was self-concealing.

244.    Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or any of the facts that could or would have led to the discovery thereof, until April 2024.

245.    Because Defendants affirmatively employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiff and the proposed Class could not have discovered the existence of this unlawful conduct any earlier than April 2024. Such acts and techniques include, among other things, private and concealed conversations, non-public trading activity and nonpublic meetings. In fact, for the manipulation to be effective, no one outside Defendants would know Defendants' true plans.

246.    Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled during the period of such fraudulent concealment.

## CAUSES OF ACTION

### COUNT I:
### VIOLATION OF THE SHERMAN ACT
### 15 U.S.C. §§ 1, 15

247.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

248. From at least January 1, 2021 and continuing to the present, Defendants, with each other, and with OPEC, entered into and engaged in a continuing agreement, understanding, and conspiracy in an unreasonable and unlawful restraint of trade to allocate the market for, and artificially fix, increase, or stabilize the price of WTI crude oil, WTI futures and options, swaps, and other financial instruments tied to WTI crude oil in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Defendants' conspiracy is a *per se* violation of federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

249. Defendants' conspiracy and the resulting impact on WTI crude oil, WTI futures and options, swaps, and other financial products tied to WTI crude oil affected U.S. interstate commerce.

250. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property. These injuries include, but are not limited to, receiving artificial and non-competitive prices for WTI crude oil, WTI futures and options, swaps, and other financial instruments tied to WTI crude oil. Plaintiff was also deprived of the benefits of free and open competition in the market for the purchase of WTI futures and options, swaps, and other financial instruments tied to WTI crude oil. Plaintiff and members of the Class are each entitled to treble damages for Defendants' violations of the Sherman Act alleged herein.

251. As a material and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property. These injuries include, but are not limited to, transacting in WTI futures and options, swaps, and other financial instruments tied to WTI crude oil at artificial and non-competitive prices. Plaintiff and members of the Class

were also deprived of the benefits of free and open competition in the market for WTI futures and options, swaps, and other financial instruments tied to WTI crude oil.

252.    Plaintiff and Class members are entitled to treble damages and other relief for Defendants' violation of the Sherman Act alleged herein.

## COUNT II:
## MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT
### 7 U.S.C. §§ 9, 25, 17 C.F.R. § 180.2

253.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

254.    From no later than January 1, 2021, Defendants have collectively coordinated their production decisions, leading to production growth rates lower than would be seen in a competitive market, despite high oil prices and healthy global demand.

255.    Defendants intended to affect or acted recklessly with regards to affecting prices of WTI crude and WTI futures and options contracts and engaged in overt acts in furtherance of that intent.

256.    Defendants' conduct proximately caused injury to Plaintiff and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices during the Class Period.

257.    The manipulative and deceptive devices employed by Defendants and their conspirators and agents, deprived Plaintiff and the Class of a lawfully operating market during the Class Period and caused them to transact at artificial prices which directly led to injury and economic damages.

258.    Plaintiff and Class members are entitled to actual damages and other relief from Defendants.

## COUNT III:
## PRINCIPAL-AGENT LIABILITY
## UNDER THE COMMODITY EXCHANGE ACT
## 7 U.S.C. § 13(b)

259.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

260.    Defendants' traders, employees, and/or officers, and conspirators acted as agents for their principals, Defendants, when engaging in the manipulation and manipulative and deceptive devices and schemes described herein.

261.    Defendants are liable for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

262.    The principal-agent violations by Defendants and their conspirators and agents deprived Plaintiff and the Class of a lawfully operating market during the Class Period and caused them to transact at artificial prices which directly led to injury and economic damages.

263.    Plaintiff and the Class are entitled to actual damages and other relief from Defendants.

## COUNT IV:
## AIDING AND ABETTING
## UNDER THE COMMODITY EXCHANGE ACT
## 7 U.S.C. § 13(a)

264.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

265.    Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein, including violations by the other Defendants.

266.    Defendants did so knowing of their violations of the CEA and willfully intended to assist these manipulations, which resulted in CME WTI futures and options prices, and their underlying physical commodity, becoming artificial, during the Class Period.

## COUNT V:
## UNJUST ENRICHMENT AND DISGORGEMENT

267.    Plaintiff incorporates by reference and re-alleges all the allegations in this Complaint, as though fully set forth herein.

268.    Defendants financially benefited from their acts

269.    In addition to being unlawful, Defendants' acts are also unfair and inequitable. For any of these reasons, Defendants' retention of the benefits is inconsistent with justice and violates the fundamental principles of equity and good conscience.

270.    The inequitable acts alleged herein caused Plaintiff and other members of the Class to suffer injury, lose money, and transact WTI futures contracts at artificial prices.

271.    Each Defendant should pay its own unjust enrichment to Plaintiff and members of the Class.

272.    Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

## PRAYER FOR RELIEF

273.    Plaintiff, on behalf of itself and the proposed Class of similarly situated entities, respectfully request that the Court:

a.    Determine that this action may be maintained as a Class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, and declare Plaintiff as the representative of the Class;

b.  Decree that Defendants and their co-conspirators have unlawfully conspired to violate of Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.  Decree that Defendants violated the CEA and award appropriate damages;

d.  Decree that Defendants have been unjustly enriched by their wrongful conduct and award restitution to Plaintiff;

e.  Find Defendants jointly and severally liable for the damages incurred by Plaintiff and the Class;

f.  Award the Class treble damages;

g.  Award reasonable attorneys' fees and costs;

h.  Award all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity from the date of service of the initial complaint in this action;

i.  Permanently enjoin Defendants from continuing their unlawful conduct; and

j.  Order such other, further and general relief as is just and proper.

## DEMAND FOR A JURY TRIAL

274.  Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, on behalf of itself and the proposed Class, demands a trial by jury on all issues so triable.

Respectfully submitted,

PEIFER, HANSON, MULLINS & BAKER, P.A.

*/s/ Matthew M. Beck*_____
Matthew M. Beck
20 First Plaza Center, Suite 725
Albuquerque, NM 87102
Tel.: (505) 247-4800
mbeck@peiferlaw.com

KIRBY McINERNEY LLP

Sarah E. Flohr (*pro hac vice* forthcoming)
David E. Kovel (*pro hac vice* forthcoming)
James A. Isacks (*pro hac vice* forthcoming)
250 Park Avenue, Suite 820
New York, NY 10177
Tel.: (212) 371-6600
dkovel@kmllp.com
sflohr@kmllp.com
jisacks@kmllp.com

Anthony F. Fata (*pro hac vice* forthcoming)
Cormac H. Broeg (*pro hac vice* forthcoming)
211 West Wacker Drive, Suite 550
Chicago, IL 60606
Tel.: (312) 767-5180
afata@kmllp.com
cbroeg@kmllp.com

*Counsel for Plaintiff and Putative Class*